## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAISH MARKOS, individually on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br>v.<br><br>RUSSELL BRANDS, LLC,<br><br>     Defendant. | Case No.: 7:16-cv-04632 (CS)<br><br>***Defendant's***<br>***Motion for Summary Judgment***<br><br><br>**ORAL ARGUMENT REQUESTED** |

---

## LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF
## DEFENDANT RUSSELL BRANDS, LLC'S
## MOTION FOR SUMMARY JUDGMENT

---

Michael R. McDonald, Esq.
Joshua S. Levy, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Defendant*
*Russell Brands, LLC*

# TABLE OF CONTENTS

**Page**

STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................................................1

I.    INTRODUCTION ...................................................................................................1

II.    PLAINTIFF AND HIS NEVERFLAT® BASKETBALL ..................................1

III.    INTRODUCTION TO NEVERFLAT® BASKETBALLS ..................................7

        a.    Background to Spalding.....................................................................7

        b.    Basketball Types, Components, And Behavior ................................7

        c.    Development And Manufacturing Of Neverflat Basketballs...................9

        d.    Neverflat® "Marketing" .................................................................11

                i.    The Six-Sided Packer.........................................................11

                ii.    The Spalding Website .........................................................14

        e.    Neverflat® Warranty, Sales, And Customer Service ...........................16

IV.    PLAINTIFF'S KNOWLEDGE & EXPERIENCE WITH BASKETBALLS ..................18

V.    PLAINTIFF'S PRE-PURCHASE "RESEARCH" AND RELIANCE.............................20

        a.    Supposed Sources Of Information Encountered By Plaintiff Prior To Purchase ...........................................................................20

        b.    Substantive Messaging Viewed By Plaintiff Prior To Purchase ..........................21

VI.    ROAD TO LITIGATION .....................................................................................23

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Civil Rules for the United States District Court for the Southern District of New York, Defendant Russell Brands, LLC ("Russell" or "Spalding") submits this Statement of Material Facts in support of its Motion for Summary Judgment:

## I.   INTRODUCTION

1.    This is a putative class action challenging the label statements and other marketing statements on Defendant's Spalding Neverflat® basketballs.  (E.g., Compl. ¶¶ 1-13.) Plaintiff Markos claims the Spalding Neverflat® marketing statements were false and that his Neverflat® did not perform in accordance with those representations, specifically, that Neverflat® was "guaranteed to stay fully inflated, and to maintain rebound height between 54 and 60 inches over 12 months."  (Id.)  Plaintiff Markos claims he was injured because he paid a higher price, a "price premium" for his Neverflat® basketball than he should have paid.  (Id.)

## II.   PLAINTIFF AND HIS NEVERFLAT® BASKETBALL

2.    Plaintiff bought his "Spalding Neverflat® Outdoor Basketball – Official Size 7 (29.5")" from non-party Amazon.com, on August 23, 2015, for $21.99.  (Id. at 39:12-16, 45:4-10, 56:7-10 & 139:15-19; see also Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].) Including "taxes," he paid a total of $23.61.  (Ex. A to McDonald Decl. [Markos Tr.] at 52:9-14.) The ball shipped on August 26, 2015 and was received about two days later.  (Id. at 52:21-53:2; see also Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].)[1]

3.    Plaintiff's Neverflat® was delivered by Amazon directly to Plaintiff's house, inflated and inside a cardboard Neverflat® packer.  (Ex. A to McDonald Decl. [Markos Tr.] at

---

[1]    Plaintiff bought this basketball "[b]ecause it's a Never Flat and we play outdoors and it's a basketball" (Ex. A to McDonald Decl. [Markos Tr.] at 51:9-11), but Plaintiff did not know what makes a basketball an Outdoor or an Indoor/Outdoor basketball.   (Id. at 51:20-23.)

52:21-53:2, 89:22-90:15 & 130:2-10.)[2]  Plaintiff himself opened up the packaging and discarded it "right after I opened it."  (Id. at 90:16-19 & 125:10-19.)   He took no photographs of the packer.  (Id. at 91:24-92:3.)  As of Plaintiff's deposition, the valve cap sticker on his Neverflat[®] basketball (to be discussed further) had been discarded and while Plaintiff did not recall whether his Neverflat[®] came with the sticker (id. at 124:13-125:3), he acknowledged that "[i]f this is how the packaging is, then more likely it did come with [the sticker]."  (Id. at 125:7-9.)

4.     Plaintiff Markos dribbled and played with the ball on the day he received it and the ball appeared to meet his expectations, without any noticeable problems with its air pressure or bounce height.   (Id. at 130:11-22.)   Plaintiff's ball was—even to him—performing "adequately" up through late September or early October 2015.  (Id. at 153:9-14.)

5.     The **only** complaint that Plaintiff had with his Neverflat[®] ball was that, in or around late September/early October 2015—for a few days—and after playing with his ball about 3 or 4 times, it appeared to "not bounce the same way as it did before."  (Ex. A to Decl. of Michael R. McDonald ["McDonald Decl."] at 129:9-10, 130:23-131:8, 137:15-18, 150:13-15, 150:19-23, 163:10-16, 177:12-18 & 199:4-17.)   Plaintiff was crystal clear that there were no other complaints or problems he had with the ball.  (Id. at 161:5-162:17; see also id. at 163:17-19 ("Q. Are you discerning any other inadequacies of the ball's performance?  A. No.").)[3]

6.     At no point was Plaintiff unable to use his Neverflat[®] to play the game of basketball.  (Id. at 161:5-162:5.)

7.     Within a matter of "days" (id. at 162:25-163:3), or maybe within a week (id. at

---

[2]     The packer image in the Complaint (p. 7) is not a picture of the box Markos received  (Ex. A to McDonald Decl. [Markos Tr.] at 91:17-22.), but "it is very similar" (id. at 91:7-8). Neverflat[®] packers have gone largely unchanged over the years.  (Collins Decl. ¶ 15.)
[3]     Plaintiff bought the ball for his son.  (Ex. A to McDonald Decl. [Markos Tr.] at 42:13-15.)  Plaintiff had no recollection about what his son was complaining about, if anything, and testified that "mostly [the complaining] was from me."  (Id. at 159:14-160:7.)

164:21-23)—playing with it, Plaintiff guessed, maybe "three to four times"—he put the ball away, "forgot about it," and never used it again.  (Id. at 136:22-24, 138:14-15, 151:18-23, 156:3-6, 156:16-22 & 159:8-9.)

8.    Plaintiff **never** measured how high his basketball bounced, either before or after he became dissatisfied.  (Id. at 155:12-18; see also id. at 175:3-6 ("Q. Do you know whether your Never Flat Basketball ever rebounded to between 54 and 60-inches?  A. I did not measure it.").)  He admitted: "I don't know how much [my ball] bounced or did not bounce" (id. at 165:5-17), and that there is *no way to know* how high it bounced at this time.  (Id. 165:18-166:10.)  Plaintiff **never** measured the air pressure of the ball, either before he gleaned this "inadequacy" or after, and has no idea what the pressure of the ball was *at any point*.  (Id. at 175:7-177:11.)

9.    The degree of rebound-height fluctuation, if any, from August 2015 to late September/early October 2015 is unknown.  Plaintiff, ███████████████ (Ex. A to McDonald Decl. [Markos Tr.] at 152:11-12), could only say that—once he started gleaning "problems"—his ball was bouncing "presumably below the waist."  (Id. at 153:15-18.)  Prior to late-September/early October, the ball was bouncing "adequately," which he explained as: "I think it's very -- it's more like a feel I would say.  So you feel how much it should bounce.  If you have to exert a lot more as opposed to it bouncing itself . . . I can only mention what is adequate for me.  I will not be able to tell you what is adequate for you or adequate for any other person."  (Id. at 152:21-24 & at 154:21-155:11.)

10.   At his deposition, Plaintiff had no idea whether whatever "inadequacy" he discerned with the ball during those days or week prior to putting it away ever grew worse.  (Id. at 139:5-11, 150:24-151:23 & 246:6-247:15.)  Since purchase, Plaintiff's Neverflat® basketball was never re-inflated.  (Id. at 134:3-135:13 & 141:21-23.)

11. Plaintiff's position is that his Neverflat basketball became "flat," as he understood the term (and as used in the Complaint): "I think the ball is flat when it has less air in it. So when I got the ball it was adequately inflated. When it lost air, it became flat. It lost air after I bought it. So it became flat." (Id. at 148:3-7; see also id. at 146:23-147:4 ("My testimony is that the basketball is flat . . . [because] [t]his basketball has lost air since I bought it.").)

12. Plaintiff's basketball was brought to the deposition, which took place on April 4, 2017, 20 months from purchase. (See generally Ex. A to McDonald Decl. [Markos Tr.] & Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].) Photos were taken of the ball, which clearly show it has retained its round shape since purchase, on August 23, 2015, and still had air in it:



(Ex. O to McDonald Decl. [Russell_02098].)

13. Plaintiff was asked to hold his ball and press into it; he acknowledged that his Neverflat® ball still had air—over a year and a half after purchase. (Ex. A to McDonald Decl. [Markos Tr.] at 147:5-13 & 243:23-25.) He was then asked whether "that ball is flatter now than it was when you first passed it off to your attorney", and could only answer that it "would be difficult for me to say," even while pushing into it without meaningful success. (Id. at 243:2-15.) Attempting to push into the ball as hard as he could with his fingers, he was "[n]ot even close" to being able to depress or deflect the ball from its round shape. (Id. at 244:2-7.) In fact, he could not compress anywhere on the ball: Not half an inch; not a quarter of an inch; and when asked

4

further, he only said: "I would not know what an eighth of an inch is."  (Id. at 244:8-16.)

14.     While the Complaint contends (Compl. ¶ 14) Plaintiff's Neverflat® basketball became "flat," Plaintiff's demonstration revealed the ball was not "flat" as he understood the term (id. at 148:3-7 & 146:23-147:4), but admittedly continued to have significant air pressure well over one year after purchase, and Plaintiff's complaints were only that the ball, used 3 or 4 times *may* have bounced a little differently—some unknown and unknowable amount—than when Plaintiff first received it.  (Ex. A to McDonald Decl. [Markos Tr.] at 150:13-15, 150:19-23, 163:10-16, 177:12-18, 155:12-18, 175:3-6, 165:5-17, 165:18-166:10 &175:7-177:11.)

15.     Plaintiff admitted he did not know whether his Neverflat® ball had less air at the time of his deposition than when he purchased it:

> Q. . . . *[H]ow do you know your ball has less air now than when you first received it?*
> A. *I did not say that I knew that.*  I have not measure[d] the air inside this.  I don't know what pressure it's got.  I have not bounced it to measure the height.
> . . .
> Q. . . . Is it possible that your ball has as much air in it now as it did when you first received it?
> A. No.
> . . .
> Q. How do you know?
> A. . . . [A]s I found out in October, September/October, it didn't bounce the same.  I do not think that that between October, September 2015 to today that it would have got anymore bounce or anymore air inside it.
> *Q. What about less?*
> *A. Unless I measure it, I would not know.*

(Id. at 246:6-247:14.)[4]

---

[4]     Although Paragraph 29 of the Complaint alleges that "independent testing by a reputable testing facility demonstrated that Defendant's claims are false inasmuch as: a) Each Product lost approximately 2 psi over a 200 day period; b) The Products' rebound height initial rebound height is actually between 46 inches and 48 inches, not between 54 inches and 60 inches; and c) The Products' rebound height decreases by approximately 0.0125 inches each day (5% over approximately 200 days)"—when asked if his ball "specifically experienced these problems", Plaintiff answered, "I don't think -- I think this is not for this specific ball."  (Ex. A to Decl. of Michael R. McDonald ["McDonald Decl."] at 160:24-161:4.)

16.     No one—including Plaintiff and Plaintiff's experts—has ever tested Plaintiff's Neverflat® basketball in any way, including measurements of rebound height or air pressure.  (Id. at 155:12-18, 175:3-6 & 175:7-177:11; Ex. G to McDonald Decl. [McFadden Tr.] at 20:22-21:3; Ex. H to McDonald Decl. [Brown Tr.] at 101:21-102:5; see also Exs. CC & DD to McDonald Decl. [Expert Reports of Jeffrey McFadden/i3 Engineering ("i3 Rep.") & Stuart B. Brown, Ph.D./Veryst Engineering ("Veryst Rep.")].)  In fact, Plaintiff's experts did not even test the *model* of Plaintiff's Neverflat® basketball in any way.  (Compare Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase] with Exs. CC & DD to McDonald Decl. [i3 Rep. & Veryst Rep.].)

17.     Similarly, neither Plaintiff *nor his experts* undertook *any* testing or assessment of the validity of the "10x longer" claim or performed *any* measurements of air pressure retention over time in Neverflat® basketballs or any others.  (See generally Exs. CC & DD to McDonald Decl. [i3 Rep. & Veryst Rep.].)  As Plaintiff's principal engineering expert, i3 Engineering, testified at his deposition: "Q. . . . Do you know whether Neverflat basketballs maintain air pressure ten times longer than traditional balls?  A. I do not."  (Ex. G to McDonald Decl. [McFadden Tr.] at 25:23-26:1.)[5]  Plaintiff's other engineering expert essentially testified to the same: "Q. . . . [D]o you recall that the front cover of the packaging for NeverFlat basketballs says 'Stays inflated 10 times longer, guaranteed'?  A. If that's their representation, I have no reason not to – to dispute that."  (Ex. H to McDonald Decl. [Brown Tr.] at 50:19-23.)

18.     In contrast, Spalding's experts tested various Neverflat® and non-Neverflat® basketballs and demonstrated, among other things, that Neverflats® (1) "stay inflated 10x longer" than traditional basketballs, (2) stay inflated for one year, and (3) rebound as would other retail basketballs.  (See generally Ex. J to McDonald Decl. [Expert Report of Donald A. Sandusky,

---

[5]       Messrs. McFadden & Brown are Plaintiff's engineering experts, further discussion of which will be undertaken in Daubert motions to exclude and on opposition to Plaintiff's anticipated motion for class certification.

Ph.D. ("Sandusky Rep.")].)

III.   **INTRODUCTION TO NEVERFLAT® BASKETBALLS**

    a.   **Background to Spalding**

19.   Russell (or its affiliated entities) is a leading developer, manufacturer, and seller of apparel and sporting goods, under various brands including Fruit of the Loom® and Spalding®. (Declaration of Brian Collins ["Collins Decl."] ¶ 1; Declaration of Lynn C. Smith ["Smith Decl."] ¶ 1; see also Ex. C to McDonald Decl. [Smith Tr.] at 7:1-4.)

20.   The Spalding brand is responsible for multiple lines of basketballs, at every major retail market and institutional price point.  (Collins Decl. ¶ 2.)  Founded in 1876, Spalding has been manufacturing and selling basketballs for well over one hundred years.  (Id.)  Spalding— and Russell—is now headquartered in Bowling Green, Kentucky.  (Id.)

    b.   **Basketball Types, Components, And Behavior**

21.   There are myriad types, qualities, and constructions of basketballs.  (Smith Decl. ¶ 2; see also Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 16.)

22.   Among other things, Spalding manufactures and sells basketballs intended for both consumer recreational use and competitive, institutional or professional gameplay.  (Collins Decl. ¶ 3; Smith Decl. ¶ 3; see also Ex. E to McDonald Decl. [Sullivan Tr.] at 49:6-18.)

23.   All current Neverflat® basketball models (and the vast majority of Neverflat® basketball models that have ever been manufactured) fit within the consumer recreational category.  (Collins Decl. ¶ 4; Smith Decl. ¶ 4; see also Ex. E to McDonald Decl. [Sullivan Tr.] at 31:15-22 & 50:24-52:1.)

24.   Recreational basketballs generally are of two overarching construction types: (1) Outdoor basketballs, typically constructed with a less expensive rubber cover material; and (2) Indoor/Outdoor basketballs, typically constructed with more expensive so-called "composite"

cover materials (intended to mimic the look and feel of leather).  (Smith Decl. ¶ 5; <u>see</u> <u>also</u> Ex. C

to McDonald Decl. [Smith Tr.] at 25:6-27:8; Ex. E to McDonald Decl. [Sullivan Tr.] at 39:5-9.)

25.     Recreational basketballs—whether Outdoor or Indoor/Outdoor—are themselves

generally built of four primary components (listed from the inside, out):

-   **Bladder**: Innermost layer, in which air (or, for Neverflat® basketballs, a specialized gas
    mixture) is pressurized.  The bladder is constructed of some mixture of butyl (aka,
    synthetic) and natural rubber.  The higher the butyl-to-natural rubber ratio, the greater the
    air retention of the bladder. ███████████████████████████████████████████████
    ████████████████████████████████.
-   **Windings**: A layer of thread, which provides shape retention and durability.
-   **Carcass**: A layer (generally of natural rubber), which provides most of the
    thickness/mass of a basketball.
-   **Cover**: This is the outer-most layer of a basketball, which the user touches while playing.
    There are various types and qualities of cover material across a wide spectrum, which
    contribute to different grip attributes, "feel", strength and abrasion resistance, bounce
    height, and aesthetics.

(Smith Decl. ¶ 6; <u>see</u> <u>also</u> Ex. B to McDonald Decl. [Collins Tr.] at 38:19-39:2; Ex. C to

McDonald Decl. [Smith Tr.] at 29:2-30:11 & 32:7-33:20; Ex. E to McDonald Decl. [Sullivan

Tr.] at 20:19-21:5 & 32:17-23; Ex. F to McDonald Decl. [Hu Tr.] at 22:17-21; Ex. J to

McDonald Decl. ["Sandusky Rep."] ¶ 19.)

26.     Cover material lends a basketball its categorization as Outdoor (rubber) or

Indoor/Outdoor (composite).  (Smith Decl. ¶ 7; <u>see</u> <u>also</u> Ex. E to McDonald Decl. [Sullivan Tr.]

at 56:15-20; Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 19.)  There are varying qualities and

performance characteristics within these categories, but Outdoor balls are generally less

expensive and made with lower quality covers than Indoor/Outdoor balls.  (Smith Decl. ¶ 7; <u>see</u>

<u>also</u> Ex. C to McDonald Decl. [Smith Tr.] at 82:23-83:1; Ex. E to McDonald Decl. [Sullivan Tr.]

at 30:22-24 & 96:22-97:2; Ex. F to McDonald Decl. [Hu Tr.] at 21:21-23:7; Ex. J to McDonald

Decl. ["Sandusky Rep."] ¶ 19.)   All else being equal, an Outdoor basketball will generally

bounce higher than a ball made of "composite leather" for Indoor/Outdoor play.  (Smith Decl. ¶

7; Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 90 & Figs. 14-15.)

27.    Inflatable sports products—including traditional consumer basketballs *and* Neverflats®—are impacted by the ambient environment, including by variations in barometric pressure, altitude, and temperature.  (Smith Decl. ¶ 8; <u>see also</u> Ex. C to McDonald Decl. [Smith Tr.] at 99:2-10; <u>see</u> <u>generally</u> Ex. J to McDonald Decl. ["Sandusky Rep."] ¶¶ 21-38.)   For example, a basketball played outside, in cold weather (without "losing air") will exhibit lower air pressure and likely diminished bounce performance; and (without inflation) when that ball is returned to room temperature, or higher, it will return to its previous thermodynamic state and increased bounce performance.   (Smith Decl. ¶ 8; <u>see</u> <u>generally</u> Ex. J to McDonald Decl. ["Sandusky Rep."] ¶¶ 21-38; <u>see</u> <u>also</u> Ex. S to McDonald Decl..)  Additionally, the height of a basketball bounce—Neverflat® or non-Neverflat®—depends on the height from which the ball is dropped, and the floor onto which it is dropped, as well as the force applied.  (Smith Decl. ¶ 8.)

**c.    <u>Development And Manufacturing Of Neverflat Basketballs</u>**

28.    Spalding has been selling Neverflat® basketballs since about late 2005/early 2006. (Collins Decl. ¶ 5; <u>see also</u> Ex. E to McDonald Decl. [Sullivan Tr.] at 20:3-8 & 27:18-20.)

29.    Neverflat® technology was created by a company known as "Primo", from which Spalding first licensed, then purchased, Neverflat® technology.  (Collins Decl. ¶ 6; Smith Decl. ¶ 9; <u>see also</u> Ex. B to McDonald Decl. [Collins Tr.] at 65:19-24.)

30.    The superior air retention technology built into Neverflat® basketballs was scientifically demonstrated by Primo to Spalding (with Spalding's input and assistance) in or about 2005.  (Collins Decl. ¶ 7; Smith Decl. ¶ 10; <u>see also</u> Ex. C to McDonald Decl. [Smith Tr.] at 208:11-209:3; Ex. E to McDonald Decl. [Sullivan Tr.] at 21:6-15 & 26:16-27:8; Ex. P to McDonald Decl. [Primo Deck dated May 9, 2006; Russell_00058-Russell_00145].)

31.    Neverflat® technology has remained largely unchanged since product launch

(Smith Decl. ¶ 11; see also Ex. C to McDonald Decl. [Smith Tr.] at 66:2-5, 68:9-21 & 182:12-14), although the components of Neverflat® basketballs have been built into various basketball constructions over the years, and remain extant in a variety of different product lines, targeting different price points.  (Collins Decl. ¶ 8; Smith Decl. ¶ 11; see also Ex. B to McDonald Decl. [Collins Tr.] at 37:10-12 & 57:17-20; Ex. C to McDonald Decl. [Smith Tr.] at 163:12-16; Ex. E to McDonald Decl. [Sullivan Tr.] at 33:3-6, 38:3-7 & 66:10-11.)

32.     Essentially, Neverflats® are all built with the following (blended with the typical four components of a basketball):



- Neverflat® basketballs are constructed with a specially designed valve and cap system, which protects against dirt that can pry open the valve and act as a "door stop" to allow inflation gasses to exit the ball.

-

(Smith Decl. ¶ 12; see also Ex. B to McDonald Decl. [Collins Tr.] at 30:16-33:17; Ex. C to McDonald Decl. [Smith Tr.] at 24:23-25:5, 30:12-32:6, 34:14-38:4, 39:23-41:18, 42:14-44:17, 46:10-25 & 209:4-210:1; Ex. E to McDonald Decl. [Sullivan Tr.] at 22:13-24:24 & 66:19-23; Ex. F to McDonald Decl. [Hu Tr.] at 28:10-13 & 46:24-47:7; Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 19.)

(Ex. H to McDonald Decl. [Brown Tr.] at 88:22-25.)

33.     The cover material of Neverflat® basketballs (whether Outdoor or Indoor/Outdoor

lines) is also generally of a higher quality and performance than that of non-Neverflat®

recreational basketballs.  (Smith Decl. ¶ 13.)  Meaning, the least expensive Neverflat® Outdoor

basketball—even without the proprietary gas, ███████████, etc.—is *still* generally of

higher quality than the least expensive non-Neverflat® Outdoor basketball.  (Id.)

### d.   Neverflat® "Marketing"

34.   Neverflat® "marketing" has been fairly static and limited since product launch.

(Collins Decl. ¶ 9.)  While there was limited television advertising in the early years of product

sales, since well before 2010, information relating to Neverflat® basketballs has reached

consumers from Spalding in essentially <u>only</u> one of two ways: (1) Via the physical packaging

(the "packer"); or (2) online.  (Id.)

### i.   The Six-Sided Packer

35.   Almost every Neverflat® basketball—including Plaintiff's, as will be discussed—

is packaged in a six-sided cardboard packer, partially open on multiple sides.  (Collins Decl. ¶

10; <u>see also</u> Ex. E to McDonald Decl. [Sullivan Tr.] at 67:10-15.)[6]  The packer is open to touch,

which allows the consumer to grip/feel the product prior to purchase, on a store shelf.  (Collins

Decl. ¶ 10.)

36.   The Front Panel of the packer generally looks like this:

---

[6]      Some downstream retail customers may have purchased packer-less Neverflat basketballs at "discount"
retailers, when Spalding periodically sought to sell down remaining stock of a particular product line.  (Collins Decl.
¶ 12.)



(Ex. Q to McDonald Decl. [Russell_00036]; <u>see also</u> Ex. R to McDonald Decl. [Russell_00701];

Collins Decl. ¶ 11.)[7]

37.    The Neverflat® packer does not contain any statements or graphics concerning

rebound height or how high a Neverflat® basketball will bounce.  (Collins Decl. ¶ 13; <u>see also</u>

Ex. R to McDonald Decl. [Russell_00701].)

38.    The Neverflat® packer includes the following content:

-   <u>**Front Panel**</u>: Most prominently states that the Neverflat® basketball "Stays Inflated 10x
    Longer Guaranteed!*"   This representation, written in relatively large print, takes up
    approximately the bottom third of the front face of the packer as shown below:



-   <u>**Rear Panel**</u>: "Specially Designed Valve with cap eliminates leaks & keeps dirt out!";
    "Premium Composite Leather for maximum performance & handling"; and "tightens
    bladder pores to improve pressure retention".
-   <u>**Right Panel**</u>: "stays inflated 10x longer than traditional basketballs"; "Maintenance-Free
    Performance.  No need to add air pressure during the first year"; and "Highest quality
    construction utilizes premium composite leather for superior grip and control".   The
    Right Panel—toward the bottom third of the packer—also displays the following graphic:

---

7      A front-facing photograph of a packer is included at the top of page 7 of the Complaint..



The graphic shows that a Neverflat basketball will "hold[] air 10 times longer" by remaining within 7.0 psi (pounds per square inch) and 9.0 psi over one year, while "Traditional basketballs lose over 50% of air pressure" in that same time.

- **Bottom Panel**: Includes warranty language linked from the front of the packer via the asterisk at the end of "Stays Inflated 10x Longer Guaranteed!*"  The Bottom Panel states that "Your 100% Satisfaction is Spalding's Top Priority!" and contains details for the "*Limited One Year Warranty – Spalding NEVERFLAT®", discussed further below.

(Ex. R to McDonald Decl. [Russell_00701]; Collins Decl. ¶ 11.)

39.     The Neverflat® packer also features the Spalding brand name and logo, and logo of the National Basketball Association ("NBA"), stating at the top: "SPALDING IS THE OFFICIAL BASKETBALL OF THE NBA."   (Ex. R to McDonald Decl. [Russell_00701]; Collins Decl. ¶ 14.)

40.     The physical properties of the packer—that is, the thickness and makeup of the cardboard, the precise angle and shape of the folds, etc.—have changed over the years (for incremental cost purposes); but with very minor exceptions (none of which are relevant to this litigation), the content has remained the same.  (Collins Decl. ¶ 15; see also Ex. E to McDonald Decl. [Sullivan Tr.] at 27:21-28:16 & 88:19-24.)

41.     The vast majority of Neverflat® basketball purchasers purchase from physical retail stores, thus interacting in some fashion with the packer prior to purchase (Collins Decl. ¶ 16), although this is not how Plaintiff made his purchase.  (See, e.g., Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].)  In-store packaging—as well as in-store grip/feel experiences— are key drivers of basketball purchases, including purchases of Neverflat basketballs.  (Collins

Decl. ¶ 17; see also Ex. B to McDonald Decl. [Collins Tr.] at 22:11-21 & 26:2-5; Ex. E to McDonald Decl. [Sullivan Tr.] at 101:23-102:5.)

### ii.   The Spalding Website

42.     Spalding launched an informational website about Neverflat® basketballs prior to 2010, which provided some information about the product.  (Collins Decl. ¶ 18.)  This was a static website, with no e-commerce capabilities.  (Id.)

43.     In 2012, Spalding revamped its Internet presence, and added a direct-to-consumer e-commerce element.  (Collins Decl. ¶ 19.)[8]  This website, located at "shop.spalding.com," also included information about Neverflat® basketballs and allowed consumers to purchase Neverflats® directly from the company.  (Id.)

44.     ███████████████████████████ ████████████████████████████████
█████████████████████████████████[9]  No significant resources or manpower were ever invested into leveraging this site as a way to generate revenue, because Spalding did not wish to undercut its primary customers (that is, retail companies).  (Id.)

45.     The Neverflat® portion of shop.spalding.com consisted of a single webpage. (Collins Decl. ¶ 21.)   When essentially all content (which was produced in native form) is expanded and displayed, and printed to a PDF, the entirety of the webpage takes up a little less than two pages (Ex. S to McDonald Decl.), only a portion of which is excerpted in the Complaint.  (Compl. ¶ 8.)

---

[8]     For reasons entirely unrelated to this lawsuit, in 2016, Spalding again revamped its entire Internet presence, significantly simplifying the amount and nature of the information included on its company site about various products, including Neverflat® basketballs.  (Collins Decl. ¶ 19.)  The site now makes no mention of any 54-60 inch rebound height range.  See generally https://www.spalding.com/shop-by-sport/basketball/neverflat/neverflat-basketball/IN.74888E.0.0.0.0.html#start=9 (last visited Apr. 27, 2018).

[9]  ████████████████████████████████████████████████████████████ ████ ███████████ (Ex. L to McDonald Decl. [Expert Report of Joel H. Steckel, Ph.D. ("Steckel Rep.")] ¶ 33.)  Survey evidence further underscores the infrequency of consumer basketball purchases directly from brand websites.  (Id. at ¶ 37.)

46. The middle/bottom of the first page of the site—which is all the Complaint includes—contains the following graph and statements:



(Ex. S to McDonald Decl.) [10]

---

[10]  Plaintiff did not see the inch markings on this chart prior to purchase *and* has no evidence supporting the allegation that his ball failed to reach any range. (Ex. A to McDonald Decl. [Markos Tr.] at 80:4-14 & 175:3-6.) This is in addition to the reality that Spalding's consumer marketing expert demonstrated, <u>inter</u> <u>alia</u>, that (1) reasonable consumers do not interpret Spalding's *air retention* statements (like those on the packer) as also conveying that Neverflat® basketballs will maintain a rebound height of 54-60 inches and (2) reasonable consumers do not even generally *want* a basketball that exhibits this bounce-height range as a function of dribbling. (Ex. L to McDonald Decl. [Expert Report of Joel H. Steckel, Ph.D. ("Steckel Rep.")] ¶¶ 23, 46-53 & 65-68.)
Granted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Smith Decl. ¶ 14; see also Ex. J to McDonald Decl. ["Sandusky Rep."] ¶¶ 87-88.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Smith Decl. ¶ 14; <u>see</u> <u>also</u> Ex. V to McDonald Decl. [Russell_00717-Russell_00720]; Ex. C to McDonald Decl. [Smith Tr.] at 49:18-50:14 & 142:24-143:9; Ex. E to McDonald Decl. [Sullivan Tr.] at 25:3-26:12.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Smith Decl. ¶ 14.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Id.; see also Ex. W to McDonald Decl. [Russell_00746-Russell_00749].) ▮▮▮▮▮▮▮▮ (Smith Decl. ¶ 14.)
There do exist competitive, institutional rebound height specifications, promulgated by organizations including the National Collegiate Athletic Association ("NCAA") and the international Fédération Internationale de Basket-ball ("FIBA"). (Exs. X & Y to McDonald Decl.; <u>see</u> <u>also</u> Smith Decl. ¶ 14; Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 85.) For men's competitive play, balls in the NCAA are supposed to bounce between 49" and 54" when dropped from 72"; and FIBA specifies that "[t]he ball shall . . . [b]e inflated to an air pressure such that, when it is dropped onto the playing floor from a height of approximately 1,800 mm [70.87 inches] measured from the bottom of the ball, it will rebound to a height of between 1,200 mm [47.24 inches] and 1,400 mm [55.12 inches], measured to the top of the ball." (Exs. X & Y to McDonald Decl. [NCAA: Section 16 Art. 7 [2017-18 rules]; FIBA: Equipment Rule 7.3 [2014 rules]; <u>see</u> <u>also</u> Ex. J to McDonald Decl. ["Sandusky Rep."] ¶ 85.) Neither Spalding's

47.     The remainder of the shop.spalding.com website is mostly taken up with a series of questions and answers, like:

> What Is Spalding NEVERFLAT®?  The Spalding NEVERFLAT ball is the first ball ever with improved air retention technologies. Breakthrough NitroFlate air treatment enables the ball to maintain air pressure 10X longer than traditional inflated sports products. So you can spend time playing ball and not waste time finding your pump and needle.
>
> I Left My NEVERFLAT® Ball Outside And It Is A Bit Flat, Is There A Reason Why That Might Happen?  Just like traditional balls, if you stored your NEVERFLAT ball in cold conditions, the product will not bounce to the height of a ball stored at room temperature until it is "warmed up". To ensure optimal performance, always store the Spalding NEVERFLAT ball at room temperature.

(Id.)

48.     The only other non-Q&A-type information is contained at the very bottom of the site, which prominently states: "TRADITIONAL BASKETBALLS LOSE AIR ON A CONSISTENT BASIS[.]  OVER 50% IN 1 YEAR[.]"  (Id.)

e.     **Neverflat® Warranty, Sales, And Customer Service**

49.     Each Neverflat® basketball is accompanied by a "Limited One Year Warranty" stating, in part:

> Spalding warrants to the original consumer only, that the SPALDING® NEVER FLAT® basketball will be free from defects in materials and workmanship during normal use for one year from the original retail purchase date, provided (1) the product has been used and cared for in accordance with instructions accompanying the product and (2) the product has not been abused, altered or misused, or otherwise damaged through the act or neglect of the consumer or any other user of the product. The warranty with respect to the inflation of the basketball does not apply if the black valve cap is removed or if air is added or released using the inflation needle within one year after purchase.

---

internal ██████████ specifications, nor any institutional basketball ██████████ specifications (including but not limited to NCAA and FIBA) were ever advertised to retail consumers of Neverflat® basketballs.  (Smith Decl. ¶ 14; see also Ex. E to McDonald Decl. [Sullivan Tr.] at 86:3-13.)

(Collins Decl. ¶ 22; <u>see</u> <u>also</u> Ex. R to McDonald Decl. [Russell_00701].)  The warranty then provides contact information and sets forth additional limitations.  (Ex. R to McDonald Decl. [Russell_00701].)  The warranty language on the Bottom Panel of the packer concludes by noting that "Your 100% Satisfaction is Spalding's Top Priority."  (<u>Id.</u>)  And the asterisk included next to the Front Panel phrase "Stays Inflated 10x Longer Guaranteed!*" leads directly to the warranty language on the Bottom Panel.  (<u>Id.</u>)

50.    Each Neverflat® basketball *also* comes with a sticker (about 1" x 2.5") covering the valve cap itself.  (Collins Decl. ¶ 23; <u>see</u> <u>also</u> Ex. B to McDonald Decl. [Collins Tr.] at 38:23-24.)  It only states: "IMPORTANT: Do not remove the valve cap during the first year of use…those actions will negate the product warranty.   For further information, visit www.spalding.com."  (Collins Decl. ¶ 23.)

51.    Additionally, among the shop.spalding.com questions and answers was:

> Will Spalding Stand Behind This Product?  You bet.  Spalding is so confident in this 10X inflation guarantee that we are backing it up with a warranty.  The NEVERFLAT warranty is 12 months from the date of purchase and for the original consumer only. Warranty covers materials and workmanship, provided the ball has been used and cared for properly and not abused, altered or damaged through act or neglect.

(Ex. S to McDonald Decl.; <u>see</u> <u>also</u> Collins Decl. ¶ 24.)

52.    

(Declaration of Angie Doig ["Doigs Decl."] ¶ 2; Ex. D to McDonald Decl.

[Doig Tr.] 47:3-23.) 

(Doig Decl. ¶ 3.)  Notwithstanding,

(Id. at 51:6-7.)

53.    Indeed,

(Collins Decl. ¶ 25; see also Ex. Z to McDonald Decl. ["_____"]
[Russell_15649]; Ex. L to McDonald Decl. [Expert Report of Joel H. Steckel, Ph.D. ("Steckel
Rep.")] ¶ 33), _____.

54.    

_____  (Ex. AA to McDonald Decl. [Russell_00754 & Russell_00755]; see also Ex.
D to McDonald Decl. [Doig Tr.] 25:20-35:12.)

55.    Plaintiff himself did not invoke the warranty.  (Ex. A to McDonald Decl. [Markos
Tr.] at 183:17-184:13.)  He didn't pick up the phone, email, or even Google what to do when
your Neverflat® appears to be underperforming.   (Id. at 135:14-19, 184:14-24 & 227:15-25.)
Instead, he responded to a lawyer's ad and filed this nationwide class action alleging that his ball,
whose air pressure or rebound height he never tested, with which he was never unable to play,
and that—by the date of his deposition—still presented as inflated, "went flat."   (Id. at 137:24-
138:5, 147:5-13, 155:12-18, 161:5-162:5, 175:7-177:11 & 243:23-25 see also Compl. ¶ 14.)

## IV.    PLAINTIFF'S KNOWLEDGE & EXPERIENCE WITH BASKETBALLS

56.    Plaintiff Markos is not an expert in basketball construction or manufacturing and
has only limited experience playing the game recreationally.  (Ex. A to McDonald Decl. [Markos
Tr.] at 15:5-16:2, 16:9-18:5, 179:23-25, 18:25-19:4. 178:10-11 & 199:25-200:17.)

57.    Plaintiff's recreational basketball gameplay increased modestly in 2010,

███████████████████████████████████████████████

███████████████████████████████████████████████

████████   (Id. at 18:12-24:18.)  The vast majority of the Plaintiff's basketball play in the years preceding his deposition were with his son (id. at 21:14-22:2), essentially all of which has been played at a hoop on the outdoor blacktop driveway of his home, in Hopewell Junction, New York.  (Id. at 6:18-22 & 22:6-24:6.)

58.    The ball at issue in this litigation is the only Neverflat® basketball Plaintiff has ever purchased.  (Id. at 37:16-19.)  As far as other basketballs, Plaintiff could not recall which models or brands he had ever purchased or played with, before or since purchasing his Neverflat®.  (Id. at 26:3-30:7 & 180:14-19.)

59.    Plaintiff also knows essentially nothing about basketball gameplay standards.  He was not familiar with NBA or NCAA standards.  (Id. at 31:11-16.)  He could only say that he "believe[s] I have a recollection" of FIBA, but otherwise knew nothing about the organization. (Id. at 30:22-31:10.)   And the only specific knowledge he had about standards was an assumption "that there have to be standards and it's possibly based by [an] organization in Spain" (id. at 31:8-10), which he thought required that a ball "have a certain amount of air pressure, I want to say."  (Id. at 30:13-14.)

60.    Generally (and as will be further explained, in contrast with how he went about purchasing his Neverflat®), Plaintiff shops for basketballs both online and in physical stores.  (Id. at 37:20-39:4.)  Prior to purchasing the Neverflat at issue here, Plaintiff could not say when he had last purchased any basketball.  (Id. at 42:16-23.

61.    Additionally, other than what he claims to have relied upon before purchasing his Neverflat® (which will also be discussed below), Plaintiff could not recall any other features or

representations, by any basketball brand, that he relied upon to make a basketball purchasing decision in the past.  (Id. at 181:6-15 & 182:2-6.)

## V.   PLAINTIFF'S PRE-PURCHASE "RESEARCH" AND RELIANCE

62.   Sometime in the first half of 2015, Plaintiff's son requested a new basketball, to use with the hoop on the blacktop driveway outside their home.  (Id. at 40:24-43:10.)   This request was "in the back of [Plaintiff's] head", until bought the Neverflat® at issue for his son, on Amazon.com, on August 23, 2015.  (Id. at 44:6-12; see also Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].)

### a.   Supposed Sources Of Information Encountered By Plaintiff Prior To Purchase

63.   The Complaint states that, in advance of his purchase, "Plaintiff saw and relied upon the Products' **_labeling_**, Products' **_advertising_**, Products' **_packaging_**, **_and_** Defendant's **_website_** http://shop.spalding.com."  (Compl. ¶ 11 (emphasis added).)   Despite these allegations, however, Plaintiff testified that his only pre-purchase research or viewing of Neverflat®-related information was online.  (Ex. A to McDonald Decl. [Markos Tr.] at 67:6-16, 89:5-13, 166:19-23 & 167:12-13.)   Plaintiff repeatedly confirmed that _all_ Complaint references to material he viewed and/or relied upon prior to purchase regard _online_ material.  (E.g., id. at 228:15-230:16.)

64.   Prior to purchase, Plaintiff viewed no Neverflat® television or magazine advertisements, visited no physical stores, looked at or tested out no physical Neverflat® basketballs, and spoke to no one who themselves had ever purchased a Neverflat® basketball. (Id. at 61:2-62:8, 73:5-18 & 221:25-22:10.)

65.   With respect to individual sources of online material, Plaintiff's recollection was not perfectly clear; but there is no genuine dispute that, at best, he _only_ viewed shop.spalding.com and Amazon.com prior to purchase.  (Id. at 59:12-16, 70:3-14, 73:2-4, 210:2-

4.)[11]   "Most of what [Plaintiff] viewed was on Spalding's website" but he found it "difficult to say what percentage." (Id. at 69:20-70:2.)

      **b.**    **Substantive Messaging Viewed By Plaintiff Prior To Purchase**

66.    Despite the claims in the Complaint, what Plaintiff actually viewed and relied on prior to purchase was essentially limited to the "10x longer" representation and a vague notion of bounce height.  (See, e.g., id. at 59:9-11, 129:9-10 & 199:4-17.)  He had never seen the 54"-60" markers on the vertical axes of the charts depicted on shop.spalding.com.  (Id. at 80:4-19.)

67.    With respect to online "***labeling***", Plaintiff only recalled "photographs of -- if I recollect properly, there were pages where you could see the labeling.  You could zoom in I want to say." (Id. at 57:19-58:5.)  In terms of online "***advertising***", Plaintiff confessed that—other than the website content he discussed as "labeling"—he viewed no other advertising prior to his purchase.  (Id. at 59:17:60:21.)  Similarly, regarding "***packaging***", Plaintiff could only explain that "I believe there were photographs of the ball in a package . . . [o]nline." (Id. at 68:14-15.)

68.    On his own—that is, without being shown either a printout of shop.spalding.com or images of the packer—Plaintiff could not explain what substantive representations he had relied upon in advance of his purchase, although he "ha[d] a feeling it was either something with the bounce or the fact that it holds air ten times more." (Id. at 59:9-11.)

69.    At his deposition, Plaintiff was shown a printout of shop.spalding.com and he represented that he indeed viewed this website prior to purchase, including the two charts toward

---

[11]    The inconsistent nature of Plaintiff's testimony casts serious doubt on whether he viewed any relevant online material prior to purchase *at all*.  (See, e.g., Ex. A to McDonald Decl. [Markos Tr.] at 59:20-24 ("Q. . . . What advertising did you see prior to August 23, 2015?  A. I don't know if it was prior to August of 2015.  Advertising, could you explain what you mean by advertising?"); id. at 63:10-21 ("Q. Did you see Never Flat Basketball labeling or Never Flat Basketball advertising online *prior to your purchase* of this Never Flat Basketball on August 23, 2015?  A. Let me clarify the question.  Q. Please.  A. Are you asking me if I saw labeling or advertising with regards to Never Flat Basketballs at any time in the past?  Q. At any time in the past, *prior to your purchase* of the ball on August 23, 2015?  A. I don't believe so.") (emphasis added).).  Nevertheless, for purposes of this motion for summary judgment—and the Court's responsibility to draw inferences in Plaintiff's favor—we essentially ignore this troubling testimony, which he elsewhere contradicted.

the top of the site.  (Id. at 74:18-77:7 & 79:8-20.)  However, again, he admitted that he had not

actually seen the inch-mark numbers on the vertical axes of the charts (id. at 80:4-14) and,

contrary to the myriad allegations in the Complaint, he similarly confessed that he was not

expecting a basketball that bounced specifically between 54 and 60 inches.  (Id. at 80:15-19.)

70.     He understood the charts to represent that Neverflats® "stay[] bouncing the same

height," whereas traditional balls "decrease[] the ball height bounce."  (Id. at 79:21-80:3.)  He

only expected a basketball that "bounces consistently throughout the year."  (Id. at 80:15-21.)[12]

71.     Plaintiff could not recall if he had seen the representation underneath the

shop.spalding.com charts that stated: "Spalding Never Flat Basketballs maintain air pressure

over a minimum of one year."  (Id. at 82:21-83:9.)  However, he "definitely" recalled the "ten

times" representation (id. at 83:5-11), which he repeatedly noted.  (See, e.g., id. at 78:17-22 ("Q.

. . . [D]o you recall any other elements of the website shop.spalding.com that you saw prior to

your purchase?  A. Something about ten times, 10X I want to say."); id. at 82:16 ("I remember

ten times longer.").)  He understood this to mean that Neverflat® basketballs "would stay inflated

ten times more than traditional basketball[s]."  (Id. at 82:19-20.)  And, indeed, he repeated that

the "10x longer" claim was integral to his purchase decision.  (Id. at 129:9-10 & 199:4-17.)

72.     Plaintiff had no recollection of seeing other language on shop.spalding.com,

including the Q&A about Neverflat® basketballs seeming "A Bit Flat" because of "cold

conditions" (Id. at 135:24-136:12) or the reference to the Neverflat® warranty/money-back

guarantee.  Indeed, Plaintiff acknowledged that he had *never* seen or even heard of any warranty

or guarantee language until the subject was brought up at his deposition.  (Id. at 123:21-124:12;

see also id. at 183:13-16 ("Q. My understanding is that today is the first you learned of such a

---

[12]     Plaintiff essentially went so far as to insist that he believes that *any* change in rebound performance, however slight, rendered his ball flat.  (See, e.g., Ex. A to McDonald Decl. [Markos Tr.] at 81:2-8; 142:2-5; 148:8-14 & 245:21-23.)

guarantee on either the box or the website; is that right?  A. Correct.").).  He was shown both the guarantee language on the box and on the website, and recalled neither.  (Id. at 115:9-20:23.)

73.     Plaintiff was also shown the packer at his deposition, and admitted that he could not recall ever seeing the chart depicted on the right-hand panel prior to purchase.  (Id. at 115:5-8.)  Instead, all he could recall from the packer photos he supposedly saw online was "[t]he word Never Flat and I want to say the ten times longer."  (Id. at 115:17-18.)  He was explicitly asked to "take a look at this box and tell me if any of it jogs your memory" as to what packer content he saw prior to purchase; and he answered: "The NBA logo, Spalding Never Flat, ten times longer.  *That's it.*"  (Id. at 115:19-24 (emphasis added).)

## VI.     ROAD TO LITIGATION

74.     After being unsatisfied with his Neverflat® ball for a few days in September/October 2015 (id. at 162:25-163:3), Plaintiff responded to a written advertisement by his would-be counsel, Jason Sultzer, whose firm claimed to be "investigating the Never Flat Basketballs.  And that's what started the process [of his involvement in this litigation]."  (Id. at 137:24-138:5.)  Around "October/November", he reached out to Mr. Sultzer about his own Neverflat® basketball.  (Id. at 139:2-4.)  And toward the end of 2015/beginning of 2016, Plaintiff turned his basketball over to this attorney, with whom Plaintiff had a previous attorney-client relationship and was "pretty much the only lawyer [he] kn[e]w."  (Id. at 132:21-133:2 & 215:12-216:22.)  Plaintiff's engineering expert, i3 Engineering, had been hired as early as July/August 2015.  (Ex. G to McDonald Decl. [McFadden Tr.] at 19:7-15.)

75.     Plaintiff never Googled solutions or possible solutions to problems with an underperforming Neverflat® basketball.  (Id. at 135:14-19 & 227:15-25.)  He made no effort—either before or after turning his Neverflat® ball over to his attorneys—to reach out to Spalding (or any of its affiliated companies) directly, to complain about his ball.  (Id. at 183:17-184:13.)

Not by phone, not by mail, and not by email (id. at 184:14-24) because, according to Plaintiff, he didn't have "the time or the resources" to devote to such an inquiry/complaint (id. at 184:17-19), even though he *had* taken the time to return retail items before.  (Id. at 196:14-20.)  Of course, even though he testified that "[t]ime is a resource", he had "taken out my resources to be here" at his deposition (id. at 185:12-15) and to litigate this case instead.  (Id. at 227:15-25.)

76.     Via this lawsuit, Plaintiff claims no other "injury" other than the purported "price premium" damages mentioned in paragraph 12 of his Complaint.  (Id. at 196:24-198:13.)  And when asked which "less expensive" basketballs he opted against purchasing, Plaintiff could only answer, "[t]he ones that you would buy from any of the stores," without being able to recall which alternative products or brands he was considering, or which websites he may have visited to research alternatives.  (Id. at 128:13-129:8.)[13]  Among other failings, Plaintiff's "damages" expert, Colin Weir, grounded his report on the assumption that "consumers . . . receive no value from the Neverflat technology," which accordingly renders his report useless as an attempt to construe *Plaintiff's* basketball as having been unjustifiably priced as compared to other basketballs.  (Ex. T to McDonald Decl. [Expert Report of Colin Weir ("Weir Rep.")] at ¶ 3.)

77.     In any event, via letter dated February 5, 2016, Plaintiff's counsel sent Spalding a letter titled, "Jaish Markos, et al. v. Russell Brands, LLC (Potential Class Action Lawsuit)," writing only that "We represent Mr. Jaish Markos, a New York consumer who purchased the Spalding NEVERFLAT basketball.  We have attached a draft class action complaint, which we will file within three business days unless we hear back from you regarding any information you may have that refutes our claims."  (Ex. BB to McDonald Decl. [Draft Compl.])  The Draft

---

[13]     Although in Paragraph 15 of the Complaint, Plaintiff writes that "[i]f the Products' representations were true, Plaintiff would imminently purchase the Products", Plaintiff admitted that this was not true, explaining that all this sentence means is that "if [his ball] did what it said it did" and "if what your company said was true" then he "would not have a complaint" and "would not have any problems with the basketball."  (Ex. A to McDonald Decl. [Markos Tr.] at 182:13-183:3.)

Complaint, signed via "s/" by Plaintiff's counsel, was dated February 2, 2016.  (Id.; Ex. A to McDonald Decl. [Markos Tr.] at 139:25-140:5.)  This was the first time Spalding was contacted by Plaintiff or his attorneys (id. at 192:2-7), despite the Draft Complaint's explicit allegation to the contrary.  (Ex. BB to McDonald Decl. [Draft Compl.] at ¶ 82.)  Moreover, the factual allegations contained in the Draft Complaint *are not the same* as those contained in the filed Complaint, the former document alleging *only* allegations relating to bounce height and silent on the air retention claims that ultimately formed the basis of the filed pleading.  (See, e.g., id.).

78.   Plaintiff reviewed the Draft Complaint before his attorneys sent it to Spalding. (Ex. A to McDonald Decl. [Markos Tr.] at 83:3-84:5.)  He communicated feedback to his attorneys during his review of the Draft Complaint.  (Id. at 84:6-10.)  Plaintiff also reviewed the filed Complaint "more than a few times" and provided feedback to his attorneys before filing. (Id. at 53:16-55:5.)  Ultimately, Plaintiff's Complaint was filed on June 10, 2016 (Compl.; Ex. A to McDonald Decl. [Markos Tr.] at 139:21-24), about 9.5 months after Plaintiff purchased his ball.  (Id. at 140:6-11; see also Ex. N to McDonald Decl. [Plaintiff's Proof of Purchase].)

Respectfully submitted,

Dated:  April 30, 2018

By: s/ Michael R. McDonald
Michael R. McDonald, Esq.
Joshua S. Levy, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
MMcDonald@gibbonslaw.com
JLevy@gibbonslaw.com

*Attorneys for Defendant*
*Russell Brands, LLC*