## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JAISH MARKOS, individually on behalf of
himself and all others similarly situated,

                    Plaintiff,

v.

RUSSELL BRANDS, LLC,

                    Defendant.

Case No.: 7:16-cv-04632 (CS)


**ORAL ARGUMENT REQUESTED**


## BRIEF OF DEFENDANT RUSSELL BRANDS, LLC
## IN SUPPORT OF MOTION TO EXCLUDE
## REPORT AND TESTIMONY OF PLAINTIFF'S EXPERT WITNESS
## JEFFREY MCFADDEN, i3 ENGINEERING SCIENCES
## (*DAUBERT BRIEF ONE OF THREE*)


Michael R. McDonald, Esq.
Joshua S. Levy, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Defendant*
*Russell Brands, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY BACKGROUND: THE i3 ENGINEERING TESTING REPORT ...................... 1

LEGAL STANDARD ....................................................................................................... 3

LEGAL ARGUMENT ...................................................................................................... 5

I.      MCFADDEN'S OPINIONS FAIL <u>DAUBERT'S</u> "FIT" REQUIREMENT BECAUSE HE DID NOT EVALUATE NEVERFLAT PRESSURE RETENTION PERFORMANCE OR NEVERFLAT MARKETING STATEMENTS. ............................ 5

II.     THE OPINIONS FAIL TO SATISFY ANY <u>DAUBERT</u> RELIABILITY FACTORS, WERE DEVELOPED SOLELY FOR THIS LITIGATION, ARE INHERENTLY SPECULATIVE, DECEPTIVE, AND LACK SCIENTIFIC RIGOR. ....................................................................................................... 6

     A.     Assessing Air Retention By Bounce Alone Is Not Scientifically Reliable. ........... 9

          1.     i3's Failure To Measure Air Pressure Over Time Is Fatal And Its Excuse For Not Doing So An Obvious Red Herring. ................................. 9

          2.     A "Correlation" Between Inflation Pressure And Bounce Height Does Not Justify Substituting Bounce Height for Inflation Pressure. ....... 10

     B.     The i3 Report's Rebound Height Measurements—Deceptively Alleged In The Complaint—Contradict The Standard Upon Which i3 Relies. ..................... 11

     C.     i3's Temperature Normalization Was Not Scientifically Valid............................ 13

     D.     i3 Failed To Test Sufficient And Representative Samples Of Basketballs. .......... 15

III.    EACH TESTING "PHASE" CONTAINS ERRORS AND OMISSIONS AND IS BASED UPON DATA INSUFFICIENT TO SUPPORT I3'S CONCLUSIONS............. 18

     A.     Phase I Shows Superior Neverflat Performance. .................................................. 18

     B.     Phase II Omitted, Misrepresented and Collected Insufficient Data..................... 19

          1.     i3's Omitted Data That Did Not Support The Narrative.......................... 19

          2.     i3 Misrepresents Phase II Data By Using Limited Scale Graphs. ............ 21

          3.     i3's Phase II Data Collection Was Not Statistically Sound. ..................... 22

     C.     i3's Phase III Contradicted Mr. McFadden's Own Claims Regarding Phase II, Used Improper Inflation Gas, And Was Otherwise Unreliably Conducted...... 22

IV.    MCFADDEN IS NOT QUALIFIED TO OPINE ON BASKETBALL DESIGN, CONSTRUCTION OR INFLATION RETENTION. ...................................................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Amorgianos v. National R.R. Passenger Corp.,
    303 F.3d 256 (2d Cir. 2002)........................................................................4, 7, 12, 18

Barrera v. Brooklyn Music, Ltd.,
    346 F. Supp. 2d 400 (S.D.N.Y. 2004).......................................................................18

In re Bayou Grp., LLC,
    439 B.R. 284 (S.D.N.Y. Bankr. 2010) ........................................................................3

D & D Grp. Pty Ltd. v. Nationwide Indus., Inc.,
    2010 WL 11508568 (S.D. Cal. Apr. 21, 2010)..........................................................10

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)............................................................................................ *passim*

E.E.O.C. v. Freeman,
    778 F.3d 463 (4th Cir. 2015) ....................................................................................20

Foley v. United States,
    294 F. Supp. 3d 83 (W.D.N.Y. 2018) .......................................................................11

In re Fosamax Products Liab. Litig.,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)......................................................................4, 5

Gen. Elec. Co. v. Joiner,
    522 U.S. 136 (1997)................................................................................................4, 11

In re LIBOR,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).....................................................................3, 10

Matthews v. Hewlett-Packard Co.,
    2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) ..........................................................11

In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,
    593 F. Supp. 2d 549 (S.D.N.Y.2008).........................................................................6

In re Mirena IUD Prods. Liab. Litig.,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016)....................................................................... *passim*

In re Neurontin Mktg. and Sales Practices Litig.,
    2011 WL 3852254 (D. Mass. Aug. 31, 2011) ..........................................................25

Nimely v. City of New York,
    414 F.3d 381 (2d Cir. 2005)....................................................................................4, 18

Ravenell v. Pugmill Systems, Inc.,
    2014 WL 7146848 (D.S.C. Dec. 15, 2014) ...................................................................24

In re Rezulin Prods. Liab. Litig.,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................25

Rojas v. Marko Zaninovich, Inc.,
    2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) .........................................................18

Rowe Entertainment, Inc. v. William Morris Agency, Inc.,
    2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)........................................................16

Rutz v. Novartis Pharms. Corp.,
    2012 WL 12842794 (S.D. Ill. Dec. 7, 2012)......................................................11, 12

State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.,
    980 F. Supp. 2d 1031 (N.D. Ind. 2013) ...................................................................16

Thompson v. Queen City, Inc.,
    No. A-2002359, 2002 WL 32345733 (D.S.C. July 9, 2002) ...................................24

United States v. Frazier,
    387 F.3d 1244 (11th Cir. 2004) (en banc) ...............................................................21

United States v. Lang,
    717 F. App'x 523 (6th Cir. 2017) .............................................................................20

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007)........................................................................................3

Washington v. Kellwood Co.,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015)......................................................................3, 4

**Rules**

FED. R. CIV. P. 11(b)(1), (3)...........................................................................................13

FED. R. EVID. 401 ..........................................................................................................13

FED. R. EVID. 403 ....................................................................................................1, 4, 13

FED. R. EVID. 702 ...............................................................................................1, 3, 13, 18

FED. R. EVID. 703 ............................................................................................................1

## PRELIMINARY BACKGROUND: THE i3 ENGINEERING TESTING REPORT

Spalding Neverflat basketballs contain proprietary air retention technology comprised of various structural components to improve pressure retention and a patented air/gas mixture called "Nitroflate," a design vastly different from traditional basketballs. Spalding promotes that its Neverflat ball "stays inflated 10x longer than traditional basketballs" and that there is "[n]o need to add air pressure during the first year." Performance is guaranteed by a one-year warranty.

The Complaint claims that Plaintiff Markos's basketball did not perform as advertised, did not bounce high enough, became "flat," and, like all Neverflat basketballs, was defective. The Complaint incorporates the findings of an "Independent Test Report" prepared by Plaintiff's proffered expert witness, Jeffrey McFadden, i3 Engineering Sciences ("McFadden" or "i3"), which stated (among other things) that certain tested Neverflat basketballs showed a "performance deterioration" in rebound height which "strongly suggests a loss of gas pressure as driven by time," and that the cause of the "loss in rebound height" was "related to loss of air pressure, either via diffusion through the bladder or leaking of the air inflation valve."

For a multitude of reasons, the proffered opinions fail to comply with Evidence Rules 702, 703, 403 and principles established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny, and must be excluded. McFadden's deposition proved enlightening, raising serious concerns over the veracity of pleadings and demonstrating unequivocally that these opinions cannot survive this Court's "gatekeeping" function. For example, i3 failed to undertake even the most rudimentary task—i.e., measuring air pressure—to determine if there was air pressure loss in Neverflat balls. It failed to examine or test any individual component of Neverflat basketballs. And it failed to examine or test Plaintiff Markos's Neverflat basketball. Instead, i3 conducted "bounce tests" per its own invented

methodology, and based its conclusions in part upon a "correlation" between air pressure and rebound ("bounce") height. i3's methodology has no scientific support and fails to prove either the Complaint's allegations of air retention underperformance or Plaintiff's separate allegations about the heights to which Neverflat basketballs supposedly failed to bounce. See, e.g., Compl. ¶¶ 8, 13, 29, 32. And, foundationally flawed as they are, the bounce tests themselves were also rife with errors and obfuscations at every step, including:

- Test results were deceptively underreported by 9.4 inches, as i3 measured bounce height from the *bottom* of the ball, contrary to industry custom and the standard i3 relied upon.
- i3 was testing for *changes* in rebound height, not absolute values.
- The graphs purporting to show *changes* in rebound height were depicted on a misleadingly skewed scale, designed to exaggerate actual results.
- The testing failed to properly account for significant fluctuations in temperature.
- The Report failed to disclose test results favorable to Neverflat (in Phase II).
- Bounce tests were stopped after observing a single "favorable" result.
- Neverflat basketballs were "re-inflated" in Phase III using the wrong inflation gas.
- The models of basketballs tested were unrepresentative and selected at random.
- Mr. McFadden admitted to having no understanding of Neverflat construction.
- i3 did not even bounce test or examine the basketball which is the subject of this lawsuit.

Further, i3's role in this litigation as an *advocate for Counsel's* cause underscores that i3's testimony does not rest on a reliable foundation.   Counsel hired McFadden/i3 to "investigate" Neverflat bounce height performance *before* having a client, and *before* Plaintiff Markos had purchased a Neverflat basketball or retained a lawyer.   Counsel threatened Defendant Russell Brands, LLC ("Russell" or "Spalding") in February 2016 with a draft class action complaint premised upon i3's testing, *before* i3 had any test results unfavorable to Neverflat, and *before* it had commenced its Phase II testing in April 2016. It appears i3 reverse-engineered Counsel's theory to fit the desired outcome. i3 methodologies were infected with errors and fundamental omissions that render its conclusions, at best, speculative and unreliable, and, at worst, downright deceptive.   For all of these reasons—and more—the McFadden/i3 opinions must be excluded.

## <u>LEGAL STANDARD</u>

Admissibility of expert testimony is governed by FED. R. EVID. 702, which states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts . . .

As is universally recognized, "[t]he gatekeeping role of the court under Rule 702 is to be exercised in accordance with the criteria outlined by the Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), which are widely applied to all types of expert testimony." <u>Washington v. Kellwood Co.</u>, 105 F. Supp. 3d 293, 303 (S.D.N.Y. 2015) (citations omitted). "The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007), a process necessary at both summary judgment and class certification. <u>See</u>, <u>e.g.</u>, <u>In re Bayou Grp., LLC</u>, 439 B.R. 284, 332 (S.D.N.Y. Bankr. 2010); <u>In re LIBOR</u>, 299 F. Supp. 3d 430, § II.2.2 (S.D.N.Y. 2018).[1]

Principally, "the district court must determine whether the proffered testimony has a sufficiently 'reliable foundation,'" an inquiry that requires reference to "the indicia of reliability identified in Rule 702," and other factors identified by the <u>Daubert</u> court, including:

> (1) whether a theory or technique "can be (and has been) tested,"
> (2) "whether the theory or technique has been subjected to peer review and publication,";

---

[1] Spalding's <u>Daubert</u> motions are being submitted in conjunction with its opposition to class certification and in support of its motion for summary judgment.

(3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation,"; and

(4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community,

<u>Amorgianos v. National R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2d Cir. 2002).

All told, "[e]xpert testimony must rest on 'more than subjective belief or unsupported speculation,'" <u>Kellwood Co.</u>, 105 F. Supp. 3d at 307 (quoting <u>Daubert</u>, 509 U.S. at 599), and a district court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)).

Additionally, expert testimony must be relevant, a requirement that has been "expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" <u>In re Fosamax Products Liab. Litig.</u>, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting <u>Daubert</u>, 509 U.S. at 591). Courts must similarly ask whether expert testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>Amorgianos</u>, 303 F.3d at 265 (quotation omitted).

Finally, "expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" <u>Nimely v. City of New York</u>, 414 F.3d 381, 397 (2d Cir. 2005). "Indeed, the Supreme Court, echoed by [the Second Circuit], has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." <u>Nimely</u>, 414 F.3d at 397 (citing cases).

The i3 Report and proffered testimony fails under all applicable requirements.

**LEGAL ARGUMENT**

I.   **MCFADDEN'S OPINIONS FAIL** <u>**DAUBERT'S**</u> **"FIT" REQUIREMENT BECAUSE HE DID NOT EVALUATE NEVERFLAT PRESSURE RETENTION PERFORMANCE OR NEVERFLAT MARKETING STATEMENTS.**

Spalding promotes that Neverflat balls "stay[] inflated 10x longer than traditional basketballs" and that there is "[n]o need to add air pressure during the first year." Def.'s 56.1 Statement ¶ 38. The Complaint claims that Neverflats are defective and the advertising false based almost exclusively upon "independent testing" by i3. <u>See</u>, <u>e.g.</u>, Compl. ¶ 29.[2] However, i3 did not test the pressure retention capabilities of Neverflat basketballs. <u>See</u>, <u>e.g.</u>, McFadden Tr. (Ex. D to McDonald) 27:13-19; 152:14-19. That is, i3 did not measure air pressure over time in Neverflat or traditional basketballs and thus did not perform any analysis to address whether Neverflats "stay[] inflated 10x longer than traditional balls" or retain air pressure during the first 12 months. Instead, at Counsel's direction, <u>id.</u> at 16:25-17:2, 21:8-10, i3 conducted a three-phase "bounce test" which supposedly measured "rebound height"—the highest point to which a ball will bounce when dropped from a fixed height—but nothing else. i3 Rep. (Ex. A to McDonald Decl.); <u>see also</u> McFadden Tr. 26:11-12 ("[T]he test was to determine rebound height not air pressure."); 44:1-6 ("[W]e did not do any inflation."). Indeed, i3's Report explicitly states: "The test protocol was designed to determine rebound height of the ball." i3 Rep. 1.

McFadden's opinions fail to meet the "fit" requirement because they are untethered to any relevant marketing statements. <u>Accord</u> <u>In re Fosamax</u>, 645 F. Supp. 2d at 173. Plaintiff's motion for certification relies on i3 as evidence that Neverflat basketballs do not stay inflated "10x longer." Pl.'s Cert. Br. 4. But i3 did *nothing* to evaluate this claim. <u>See</u>, <u>e.g.</u>, McFadden Tr. 25:23-26:1 ("Q. . . . Do you know whether Neverflat basketballs maintain air pressure ten times longer than traditional balls? A. I do not."); 198:25-199:5 ("Q. . . . [D]o you believe your report

---

[2] Counsel produced the i3 Report as the "independent testing" referenced in the Complaint.

can evaluate whether Neverflat basketballs stay inflated ten times longer than traditional basketballs? A. It's beyond the scope of the report."). Moreover, to the extent the Plaintiff challenges the statement that there is "[n]o need to add air pressure during the first year," the opinions likewise do not "fit" because i3's bounce tests did *nothing* to evaluate air retention. In fact, though the Report summarizes some Spalding statements (i.e., from shop.spalding.com, i3 Rep. 4-5), i3 admitted that its "mission was not to evaluate marketing claims" at all. McFadden Tr. 83:5-18; see also id. at 153:6-7.  McFadden's opinions, therefore, do not "fit" the assertions of false advertising/defect because they do not address whether Neverflats fail to perform as advertised (e.g., whether the air retention statements—"stays inflated 10x longer than traditional basketballs" and "No need to add air pressure during the first year"— are false.").[3]

## II. THE OPINIONS FAIL TO SATISFY ANY DAUBERT RELIABILITY FACTORS, WERE DEVELOPED SOLELY FOR THIS LITIGATION, ARE INHERENTLY SPECULATIVE, DECEPTIVE, AND LACK SCIENTIFIC RIGOR.

"[A]lthough the factors outlined in Daubert are not a 'definitive checklist or test,' Daubert, 509 U.S. at 593, 113 S.Ct. 2786, 'when an expert is offering testimony that is presented as a *scientific* conclusion and the expert's method fails to satisfy any of the factors identified in Daubert, a court should pause and take a hard look before allowing a jury to consider it.'" In re Mirena, 169 F. Supp. 3d at 430 (quoting In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 593 F. Supp. 2d 549, 564 (S.D.N.Y.2008)). McFadden's opinions do not meet any of the

---

[3] The i3 Report also fails to "fit" the Complaint's dubious rebound height allegations—Neverflats fail to reach specific rebound heights—as i3 admitted it was only looking for *changes* in rebound height, not "absolute values," McFadden Tr. 77:24-25; see also id. at 54:24-55:1; 60:25-61:2; 80:10-85:1; 138:4-141:5. Also, i3 did not bounce test *Plaintiff's* Neverflat, or even the same model. Def.'s 56.1 Statement ¶ 16. The Complaint alleges that i3 showed a "reduction in performance" caused by "loss of air pressure as a result of diffusion through the products' bladder and leaking through the products' air inflation valve," Compl. ¶ 29 n. 8, i3 Report p. 21, but i3 *did not evaluate* Neverflat construction, including bladder or valve. McFadden Tr. 23:4-24:7; 205:8-206:2; accord In re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 431-32 (S.D.N.Y. 2016) ("[S]peculation, whereby the conclusions are linked to studies only by [an expert's] say-so, is impermissible under Daubert."). For these reasons, i3's Report fails to "fit."

<u>Daubert</u> factors: (a) they were not tested (even via simple air pressure measurements); (b) they were not peer reviewed (remarkably, i3's "peer," the other expert *for Plaintiff*, Veryst Engineering, rejected the i3 Report, finding it incomprehensible); (c) there is no known or potential rate of error, and no standards controlling the methodology (he invented his own test protocol, McFadden Tr. 78:14-20); and (d) there is no "general acceptance" in the relevant scientific community (no one to his knowledge has undertaken a similar rebound height testing scheme, <u>id.</u> at 78:14-17). <u>See</u> <u>Amorgianos</u>, 303 F.3d at 265.

Specifically with regard to the "peer review" factor, it cannot be over-emphasized that another of Plaintiff's own "experts" rejected the reliability of i3's Report because more than one engineer from Veryst could not understand it. Dr. Brown testified: "[W]e looked at it, didn't understand it, and that's the end of it." Brown Dep. Tr. 38:20-25. He added:

> We didn't understand really what they did, because there wasn't sufficient description of their process for us to understand what they did, and so we set it aside and developed our own methodology . . . ***both of us [at Veryst Engineering] have some intelligence, and neither of us could come up with a good conclusion [as to its meaning]***.

Brown Tr. 40:1-22 (emphasis added). Under the circumstances, it is stunning that Plaintiff's Counsel would now attempt to pass off this testimony as "expert."

Therefore, the Court must "carefully scrutinize" the facts and data upon which McFadden relied and the way he applied principles and methods. <u>In re Mirena</u>, 169 F. Supp. 3d at 449. "Expert testimony 'must be supported by appropriate validation—i.e., good grounds, based on what is known'" and "[must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>In re Mirena</u>, 169 F. Supp. 3d at 430 (quoting <u>Daubert</u>, 509 U.S. at 590). And the Court's scrutiny of scientific methods and opinions should be all the more exacting given that i3 created its Report purely for *this lawsuit*.

It is well established that "[e]xpert testimony developed solely for litigation can weigh against reliability." In re Mirena, 169 F. Supp. 3d at 430 (citations omitted). Here, i3 seemingly assumed a role, not as objective expert, but as *advocate for Counsel's cause*. That is, i3 was hired by the Sulzer Law Firm to start its Neverflat bounce height testing *before* Plaintiff Markos had even purchased a Neverflat basketball or retained a lawyer.[4] Even after Plaintiff responded to Counsel's advertisement to sue Neverflat, see Def.'s 56.1 Statement ¶ 74, i3 never looked at or dribbled *Plaintiff's* ball, never communicated with Plaintiff, bounce tested his ball, checked its air pressure or asked any questions about its performance or why he simply did not contact Spalding for a replacement under the Warranty. See id. at ¶ 16; see also McFadden Tr. 20:22-21:3. Markos's ball was newly purchased when i3 had begun its testing and thus any air pressure loss contentions could have been easily verified at the outset. Failure to attempt any validation with Markos's ball was inexplicable. All circumstances here undeniably suggest an attempt to "reverse-engineer" a theory to fit the desired outcome. In re Mirena, 169 F. Supp. 3d at 430.

As more fully described below, the manner in which i3 applied principles and methods—and ignored others—cannot survive Daubert scrutiny in any event. i3 chose not to validate its theory by measuring air retention directly, but instead made assumptions about leaking of air via a bounce correlation (a correlation not described or validated). i3 conducted bounce testing said to be based upon industry standards (but was contrary to the standard), and then failed to disclose that the Report itself graphically misrepresented rebound heights in 31 separate graphs by

---

[4] i3 was approached by the Sultzer Law Group in July 2015. McFadden Tr. 17:16-19:12; 20:6-9. Plaintiff did not even purchase his ball until August 2015. Def.'s 56.1 Statement ¶ 2. Further, as will be discussed, i3's testing was split into three "phases." i3 Rep. 7. Phase I—which i3's produced data file reveals was over by November 2015, Ex. C to McDonald Decl.—revealed *nothing* wrong with the tested Neverflats. See, e.g., i3 Rep. 21; McFadden Tr. 166:2-6. And Phase II *did not even commence until April 2016*. Ex. C to McDonald Decl. Yet, Plaintiff's Counsel still threatened Spalding with a class action based on i3's "independent testing" in *February* 2016. Ex. G to McDonald Decl.

reporting the "highest point" of a bounce by measuring to the bottom of the ball. Aside from the conspicuous technical flaws and omissions, including testing only one model ball, there was no attempt to validate the theory. Quite plainly, this is not the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." In re Mirena, 169 F. Supp. 3d at 430.

### A.     Assessing Air Retention By Bounce Alone Is Not Scientifically Reliable.

#### 1.     i3's Failure To Measure Air Pressure Over Time Is Fatal And Its Excuse For Not Doing So An Obvious Red Herring.

i3's failure to measure pressure renders its conclusions irrelevant under the "fit" requirement *and* renders its methodology critically unreliable. As Spalding's expert Daniel D. Frey, Ph.D., explained, "measuring air pressure is so fundamental to the task at hand, could have been accomplished cost effectively, [and] would have answered any questions about air retention." Frey Rep. (Ex. E to McDonald Decl.) 14. Spalding's basketball construction and Neverflat performance expert, Donald A. Sandusky, Ph.D., likewise explained that "[i]n order to determine whether a basketball will retain inflation pressure over time, the most basic, fundamental test is to check pressure within the basketball over time." Sandusky Rep. (Ex. F. to McDonald Decl.) ¶ 128. Had i3 undertaken this direct test in a comprehensive manner, it would have learned what Spalding's experts did: Neverflat basketballs "stay inflated 10x longer" and there is "[n]o need to add air pressure during the first year." Id. at Figs. 9-11.

i3 cites no industry standard or authoritative publication to justify its methodology of measuring rebound height alone to make conclusions about air pressure retention performance. And the supposed justification for not directly measuring air pressure retention is not scientifically supported.  McFadden appeared to acknowledge that measuring air pressure over time would have been the ideal method for assessing Neverflat air retention, but attempted to excuse his failure by claiming that a "direct measurement of air pressure . . . would have . . .

violated the warranty of the product." i3 Rep. 6; <u>see also id.</u> at 7; McFadden Tr. 44:10-13 & 68:19-69:1. However, as Dr. Frey explained, "[f]rom a scientific standpoint, the product warranty should not have guided the methodology for testing the manufacturer's claims." Frey Rep. 14; <u>see also</u> Sandusky Rep ¶ 130. The basketballs were purchased for litigation purposes, not recreational play, and thus the limited one-year Neverflat warranty, Def.'s 56.1 Statement ¶¶ 49-51, cannot logically excuse not testing the product for air pressure loss if the real goal was to determine whether the product was in fact losing air pressure.

Simply put, replacing air pressure measurements with bounce testing renders air retention conclusions scientifically unreliable and inadmissible. <u>Accord</u> <u>In re LIBOR</u>, 299 F. Supp. 3d at § III.1.3.2 ("[Expert] could have selected certain statistical tests to perform, . . . , identified what his null hypothesis would have been, and determined the level of statistical significance . . . But he has done none of those things, and his failure to do so makes examining the reliability of his methodology essentially impossible."); <u>D & D Grp. Pty Ltd. v. Nationwide Indus., Inc.</u>, 2010 WL 11508568, at *7 & n.10 (S.D. Cal. Apr. 21, 2010) ("[A] relatively simple device . . . does not obviate the need for testing and an analysis of the data produced by such testing.").

## 2.   A "Correlation" Between Inflation Pressure And Bounce Height Does Not Justify Substituting Bounce Height for Inflation Pressure.

i3's methodology is premised largely on the unexplained assumption that pressure has a "direct correlation to rebound height." <u>See</u> i3 Rep. 4; <u>see also</u> McFadden Tr. 66:8-23. But the absence of any analysis or attempt to understand the degree of correlation and what other factors[5] impact rebound height demonstrates the unreliability of i3's Report.  As Dr. Frey explained:

> [I]t is true that basketball rebound height correlates with air
> pressure within the ball to a certain degree, [but] this is not

---

[5] Temperature, for example, has a significant impact on performance, <u>see generally</u> Sandusky Rep. ¶¶ 21-38, a fact that i3 acknowledges, but failed to properly account for. <u>See</u> Frey Rep. 16; Sandusky Rep. ¶¶ 134-39; i3 Rep. 7. A subject further addressed below.

> sufficient reason to replace one variable for another in a scientific evaluation. Correlation is not the same as causation and so using the most direct measurement is the better approach.

Frey Rep. 5.

Simply put, "[a] loss or decline in air pressure does not mean there has been a loss of air. And, a decline in rebound height does not necessarily mean that there has been a loss or leak of air from the ball." Id. i3 "provides insufficient basis for the conclusion that there is a 'direct' correlation between rebound height and air pressure, nor is there any analysis on the effect of such a correlation in a ball ███████████████████, along with other proprietary materials." Frey Rep. 15. Thus, i3's measurements of rebound are "not a reliable substitute for assessing inflation over time." Sandusky Rep. ¶ 105; accord Foley v. United States, 294 F. Supp. 3d 83, 93 (W.D.N.Y. 2018) ("[Expert] failed to make any connection between decedent's oxygen saturation levels and the alleged lack of care by [physician]. Without more, then, this opinion is entirely conclusory and merely 'the *ipse dixit* of the expert.'")[6]; Rutz v. Novartis Pharms. Corp., 2012 WL 12842794, at *11 (S.D. Ill. Dec. 7, 2012) ("unsupported and unreliable" analysis was "not a reliable substitute" for sounder methodology). There is simply "too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 146.

**B.    The i3 Report's Rebound Height Measurements—Deceptively Alleged In The Complaint—Contradict The Standard Upon Which i3 Relies.**

The i3 Report claims that it designed a test protocol "following industry standards," namely, "FIBA [International Basketball Federation] standards." The Report states: "The test method defined by FIBA is to drop the basketball from a height of 1800 mm (70.9 inches); to be

---

[6] Case law involving medical care is instructive: Where "an expert's opinion touches upon the cause of a party's condition, 'it will satisfy Daubert's prerequisites for reliability only if the doctor conducted a meaningful 'differential diagnosis' ruling out other possible contributing factors." Matthews v. Hewlett-Packard Co., 2017 WL 6804075, at *2 (S.D.N.Y. Dec. 22, 2017) (quotation omitted).  i3 cannot reliably identify a "cause" (i.e., air loss) of some detected change (i.e., rebound height) without "ruling out other possible contributing factors."

within specification, the ball should rebound to a minimum height of 1300 mm/-100mm (51.2/-3.9 inches – 47.24 inches)." i3 Rep. 6. But the standard reads that the ball should be "dropped onto the playing floor from a height of approximately 1,800 mm *measured from the bottom of the ball*" and "rebound to a height of between 1,200 mm and 1,400 mm, *measured to the top of the ball*." Ex. B to McDonald Decl. (produced i3 appendices) at Bates 00080 (Section 7.3 of FIBA "Rules") (emphasis added). The Report then includes 31 graphs depicting rebound height, purporting to show Neverflat balls allegedly failing to reach FIBA rebound height. Id. at 9-20.

However, despite claiming it followed FIBA, i3 did not. It recorded rebound height from the bottom of the ball, McFadden Tr. 60:2-7—which is explicitly contradicted by the FIBA standard i3 claims to be following.[7] The difference between the top and bottom of a size 7 (29.5") basketball is 9.4 inches. At deposition, McFadden admitted that the rebound heights of all tests are underreported by 9.4 inches (diameter). McFadden Tr. 55:19-59:5; 84:5-11; 202:24-203:4; see also Frey Rep. 13; Sandusky Rep. ¶ 140-143 & Figs. 22 & 23.[8] And because i3's graphs purport to show rebound height under FIBA test conditions, they are misleading.

The misleading i3 Report was then used to undergird the Complaint's rebound height allegations—about Neverflat balls failing to reach certain specific heights—which expressly rely

[7] The notion that the "height" of a bounce could be measured from the bottom is also contradicted by (1) "the convention in the trade, as well as in the NCAA," Sandusky ¶ 106, and (2) the plain meaning of the word "height," defined as (a) "the part that rises or extends upward the greatest distance : the highest part (b) the most advanced or extreme point of something." https://www.merriam-webster.com/dictionary/height (last visited July 10, 2018).
[8] i3 "modified" many of FIBA's standards. McFadden Tr. 36:10; see also id. at 55:15-18 ("[W]e pulled pertinent pieces out of it"). FIBA calls for bouncing performed by "a ball shooting machine," but i3 used students. Id. at 41:15-23. FIBA requires test balls be inflated "to reference pressure," which he "did not use." Id. at 43:18-23. Similarly, the ASTM standard (also invoked by i3) is for "measuring rebound characteristics of flooring," not balls. Id. at 35:24-25. ASTM calls for "us[ing] sound," id. at 36:14, but i3 used laser beam impact system. Id. at 73:2-76:11. In fact, i3 did not know whether *anyone* had *ever* undertaken rebound height testing using this combination of FIBA and ASTM. Id. at 78:14-17. Thus, i3's protocol certainly has not "gained 'general acceptance' in the relevant scientific community." See Amorgianos, 303 F.3d at 265.

upon i3's "independent testing" to challenge the performance of all Neverflat basketballs. See, e.g., Compl. ¶ 29 ("The Products' . . . initial rebound height  is actually between 46 inches and 48 inches."), ¶ 32 ("[T]he rebound height for the Products never reached that minimum 49 inches required by the NCAA."). Thus, not only has i3's methodology been exposed as patently unreliable, the falsity of the Complaint's factual assertions has been revealed as well. See FED. R. EVID. 403 ("[E]vidence is not admissible if its probative value is substantially outweighed by the danger of . . . misleading the jury"); see also FED. R. CIV. P. 11(b)(1), (3).[9]

C.     i3's Temperature Normalization Was Not Scientifically Valid.

Inflatable products "are affected by external, environmental factors, including temperature (variability) and barometric pressure (variability), which can be caused by changes in the weather or changes in elevation." Sandusky Rep. ¶ 24; see generally id. at ¶¶ 21-38. "It is well known that higher temperatures make for higher rebound and lower temperatures will cause a ball to rebound lower." Frey Rep. 16; see also McFadden Tr. 119:8-10.

i3 allowed temperatures to vary significantly *and* failed to properly normalize for temperature. Sandusky Rep. ¶¶ 133-39. i3 undertook "[t]rials . . . to determine the impact of basketball temperature on the rebound height for each sample" then "normalized" all results to 23 degrees Celsius (73 degrees Fahrenheit). i3 Rep. 7. The Report contains no details about such "trials," but the data produced by Plaintiff, Ex. C to McDonald Decl., allowed Spalding's expert "to uncover the source numbers, which reveals . . . [that] i3's STP normalization is flawed because they did not obtain nearly enough data over a broad enough temperature range to make useful regression analysis, but rather they ***used two data points*** and 'interpolated/extrapolated'." Sandusky Rep. ¶ 137-38 (emphasis added). i3 "simply did not perform enough work." Id.

---

[9] FIBA is also *irrelevant* as Spalding makes no representations that its balls adhere to FIBA. Declaration of Brian Collins ("Collins Decl.") ¶ 19. Thus, this testimony fails to meet the relevancy tests of Rules 702 and 401 and should also be excluded under Rule 403.

Dr. Sandusky "conducted a far more comprehensive regression distributed over a broad temperature range" and obtained a Neverflat (Hexagrip SoftGrip) normalization factor of 0.27 in./degree, an almost 3x difference from i3's, id. at ¶ 139, using an approach that Dr. Frey confirmed was "thorough and well-designed" as compared to i3's "inadequate" effort. Frey Rep. 16.[10] Thus, for every degree change in temperature in which i3 conducted its testing, it *undercounted* rebound height. And—unlike Dr. Sandusky's tests, which were adequately normalized *and* undertaken in a temperate environment, Sandusky Rep. Fig. 19—i3's tests took place under substantially more variable conditions. See, e.g., Sandusky Rep. ¶ 131 ("[T]emperatures ranged from 59F to 73F with an average of 66F.").[11] Dr. Sandusky graphically depicted the temperatures at which all three experimental experts undertook their analyses:



<hr>

[10] Sandusky's temperature normalization factor for Neverflat composite was a more significant 0.36 in./degree. Sandusky Rep. ¶ 38. i3 tested on only one model of Neverflat. i3 Rep. 2-3.

[11] "What i3 didn't report was the first Phase II test was conducted at 61F, a particularly chilly day in its 'lab.'" Sandusky Rep. ¶ 114. Phase III "was measured at 71F, fully 10F higher than those in their beginning." Id. ¶ 131; see also id. at ¶ 120 ("[A] 10F increase in temperature has a significant effect toward increasing rebound height, as much as 3 extra inches.").

Sandusky Rep. Fig. 19. Dr. Sandusky explained that i3's "erratic temperature variation is highly unusual for a testing environment, and further highlights i3's lack of care, or worse, their intent to unfairly influence the testing results by temperature manipulation." Id. at ¶ 121. In sum, i3's temperature normalization efforts were "inadequate, incorrect, and conducted in a manner inconsistent with accepted scientific practices. Consequently they developed incorrect analysis and arrived at incorrect conclusions." Sandusky Rep. ¶ 144; see also id. at ¶ 106 & Frey Rep. 15.

### D.    i3 Failed To Test Sufficient And Representative Samples Of Basketballs.

Foundational flaws in the reliability of i3's analysis also include i3's failure to test sufficient and representative samples of both Neverflat and non-Neverflat basketballs. First, i3's *sample size of six balls of a single model* is inadequate to draw conclusions regarding the performance of the ████████████████████████ of different types. See Frey, Rep. p. 13-14.

Second, McFadden's selection of Neverflat ball was entirely "random" and admittedly not scientific. McFadden Tr. 91:12-92:5-11; 103:12-107:12-14. The result of this non-effort was that i3 tested six Neverflat basketballs, *all of the exact same model*: Hexagrip SoftGrip. i3 Rep. 2-3 & 24-26; see also McFadden Tr. 85:9-11. Throughout the putative class period, there have always been multiple distinct models of Neverflat balls on the market, including (when i3 began its testing) different models of *Hexagrip* ball (the "SoftGrip" Hexagrip, a rubber/outdoor product; and a composite version). See Ex. H to McDonald Decl. (Spalding 2015 Retail Price List); Collins Decl. ¶ 11; Declaration of Lynn C. Smith ("Smith Decl.") ¶ 20.[12]

 "[T]he cover material utilized for Neverflat Hexagrip products is somewhat different than the cover material utilized for other Outdoor balls." Sandusky Rep. ¶ 34 n.6. "[T]he 'Soft Grip' rubber is somewhat softer than traditional rubber, ████████████████████████████████

---

[12] Spalding has discontinued certain Neverflat models sold during the class period, including the specific model of basketball purchased by Plaintiff. Compare Ex. H to McDonald Decl. with Ex. I to McDonald Decl. (Spalding 2010 Retail Catalog); see also Collins Decl. ¶ 10.

██████████████████████████████████████████████████████." Id. at ¶ 61 n.14. This

manifests in differences in rebound height and touch/feel as compared with the Hexagrip

composite Neverflat basketballs—as well as with older rubber/outdoor Neverflat models and, of

course, other composite/indoor-outdoor products. Smith Decl. ¶ 20.

Because i3 tested only one model of Neverflat, Dr. Frey explained that "any conclusions

drawn by i3 must be limited to only that specific model." Frey Rep. 13; see also Sandusky Rep. ¶

131; accord Rowe Entertainment, Inc. v. William Morris Agency, Inc., 2003 WL 22124991, at

*1 (S.D.N.Y. Sept. 15, 2003) (expert excluded in part because "[t]he sampling used by [expert]

was not representative"); State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc., 980 F.

Supp. 2d 1031, 1049 (N.D. Ind. 2013) (quotation omitted) ("When conducting a comparative

analysis, to meet the reliability that Daubert demands, an expert must select samples that are

truly comparable. To put it another way, care must be taken to be sure that the comparison is one

between 'apples and apples' rather than one between 'apples and oranges.'").

Again, McFadden acknowledged that his selection of Neverflat was entirely random,

explaining that "I can't tell you, just that's the one I picked." McFadden Tr. 87:22-23. Or, put

differently, "*[t]here was really no science* . . . ***There was no real methodology behind picking***

***this ball.***" Id. at 88:5-24 (emphasis added). He did not know that there was more than one model

of Hexagrip, the type of cover material of his tested Neverflat, or whether the cover material on

the Hexagrip he tested was the same as other Neverflat balls. Id. at 85:12-86:1; see also id. at

90:16-23 ("I asked the Sultzer Group which Neverflat® and the response was just pick one.").

Indeed, McFadden himself admitted that his sample was not truly representative:

> Q. Do you believe that it's fair to make assumptions about all types
> of Neverflat® basketballs based on the conclusions you've reached
> with respect to the six SoftGrip Hexagrip basketballs?

    A. ***It's outside the scope of this project. I don't know enough about the Neverflat® product what is similar, what is the same. Is it the same valve? Is it the same bladder? Without knowing that and the same characteristic behaviors of those, it would be difficult to make that assumption.***

Id. at 236:16-25 (emphasis added). The i3 Report therefore must be struck to the extent used to draw conclusions about *all* Neverflat basketballs.

    Third, McFadden's choice of non-Neverflat basketballs was no less arbitrary. See, e.g., id. at 108:13-17 ("There was . . . no great investigation or anything of that sort."). *None* of the differences between ball types factored into his choice. Id. at 104:3-6. His intention was to select only *recreational* non-Neverflat basketballs to compare against Neverflat, id. at 104:22-24, but his selection included a Molten GM7, which Molten categorizes as a competition class ball.

    Spalding sells basketballs at various price points, with performance qualities along a broad spectrum. Collins Decl. ¶¶ 2-5 & 10; Smith Decl. ¶¶ 3-11. Not all products are intended for the recreational consumer. Collins Decl. ¶4; Smith Decl. ¶ 5. The NBA Game Ball, for example, is essentially designed for professional play and sold primarily to the NBA, with a leather cover material. Id. Basketballs in the competitive class are designed for college, high school and other competitive indoor game play. Id. Similarly, Molten categorizes its basketballs into multiple classes: (1) Elite Competition, (2) Competition, (3) Recreation/Training, and (4) Novelty—with the GM7 sorted into the *Competition* category. See, e.g., Exs. J-L to McDonald Decl.[13] McFadden did not know he was comparing a Spalding Neverflat recreational ball with a competition Molten ball. McFadden Tr. 105:7-106:22. This ignorance proved impactful.

---

[13] Molten currently offers two GM7 basketball models on its site, both for $44.98. Exs. J-L to McDonald Decl. Notably, i3 purchased its Molten balls from Amazon for $28.90, Ex. M to McDonald Decl., *more than i3 spent on the purchased Neverflats*. Ex. N to McDonald Decl.

### III.   EACH TESTING "PHASE" CONTAINS ERRORS AND OMISSIONS AND IS BASED UPON DATA INSUFFICIENT TO SUPPORT I3'S CONCLUSIONS.

"Each step of an expert's analysis must be reliable in order for the expert's opinion testimony to be considered in a judicial proceeding." Barrera v. Brooklyn Music, Ltd., 346 F. Supp. 2d 400, 409 (S.D.N.Y. 2004) (citing Amorgianos, 303 F.3d at 267). Here, i3 fails at every juncture. Its individual testing phases lack "a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions." Nimely, 414 F.3d at 396. It manipulates the data to reach desired conclusions, rendering the opinions wholly unreliable. See, e.g., Rojas v. Marko Zaninovich, Inc., 2011 WL 6671737, at *6 (E.D. Cal. Dec. 21, 2011) ("When data is improperly manipulated the resulting analysis is unreliable."). And it grounds its opinions in data and methodologies that are "simply inadequate to support the conclusions reached" and thus "Daubert and Rule 702 mandate [its] exclusion." Amorgianos, 303 F.3d at 266.

### A.   Phase I Shows Superior Neverflat Performance.

In Phase I of i3's testing (October to November 2015), "FIBA standards were utilized to simulate the conditions the basketballs would experience in one year of use." i3 Rep. 6; see also Ex. C to McDonald Decl.; McFadden Tr. 46:22-47:19 & 49:4-20.[14] "FIBA standards for fatigue strength state that a basketball should be bounced 20,000 times with an energy equivalent to a free fall from 1800 mm (70.9 inches)." i3 Rep. 7. i3 had college basketball players perform dribbling and then measured rebound height at 2,000 dribble intervals. Id. The Report concludes that "Phase I testing (FIBA Fatigue testing) showed little degradation over the span of the test with the Spalding NEVERFLAT® samples." Id. at 21. In fact, the data showed that the Neverflat basketballs were **_more durable than all the tested recreational non-Neverflats_**. i3 Rep. 21.

---

[14] Ultimately (like FIBA standards generally), this test is irrelevant since Spalding makes no representations regarding adherence to FIBA durability standards. Collins Decl. ¶ 19. And even Spalding's internal ███████████████ specifications are not disseminated publicly. Smith Decl. ¶ 22.

Over the course of the 20,000 bounce, "one year" simulation all Neverflats remained at statistically unchanged rebound heights, while the comparison recreational balls all experienced discernable degradation. Id. at 9-15. The Neverflats' 20,000-bounce-performance was also significant since ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████. See Sandusky Rep. ¶ 131 & n.30; see, e.g., Exs. O-Q to McDonald Decl.[15] Nevertheless, all Neverflats maintained performance throughout the rigor of 20,000 bounces and thus rebounded consistently much longer than traditional basketballs—another fact undermining i3's conclusions.

**B.      Phase II Omitted, Misrepresented and Collected Insufficient Data.**

Phase I testing was completed in 50 days, after 11-12 drop test results. Thereafter, the balls were stored for about 150 days—and then a single drop test was performed on day 200. This 200th day data point *alone* was used to draw conclusions of decreasing Neverflat performance, i3 Rep. 21, which are unreliable for numerous reasons.

**1.      i3's Omitted Data That Did Not Support The Narrative.**

As with Phase I, i3 tested non-Neverflat balls during Phase II—but that testing is not mentioned *anywhere* in the Report and not depicted in *any* of its graphs. It was only via receipt of data produced under court order, see ECF Dkt. No. 45, that revealed this hidden information. See Ex. C to McDonald Decl.[16] This cherry-picking of data is unreliable, if not downright deceptive. Frey Rep. p. 15 ("This selective disclosure of test results and procedures is contrary to well established scientific methods and underscores i3 Engineering's attempt to craft results that

---

[15] ███████████████████████████████████████████████████████████████ ████████████████████████████████, which is in plain contrast with i3's unscientific bounce tests of college students bouncing balls with no checks on consistency.

[16] McFadden could not explain why he concealed this data : "I don't know why . . . I don't really have a good reason other than the focus of it was really on the Neverflat balls. . . . I really don't have a good answer for you." McFadden Tr. 144:7-147:19; see also id. at 141:6-144:6.

supported a hypothesis."); see, e.g., United States v. Lang, 717 F. App'x 523, 536 (6th Cir. 2017) ("[C]herry-picking data is just as bad as omitting it or making it up altogether."); E.E.O.C. v. Freeman, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, C.J., *concurring*) ("[C]herry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes.") (citing cases).

Significantly, i3's data actually reveals that the Neverflat balls had significantly less "decline" in rebound height compared to competitors' balls. Ex. C to McDonald Decl.

| Sample No. | Basketball Type | Rebound Height "Decline" During Phase II[17] |
|---|---|---|
| 1 | Wilson | *No data—totally flat.* |
| 2 | Neverflat® | *1.32 inches.* |
| 3 | Under Armour | *6.38 inches.* |
| 4 | Under Armour | *6.00 inches.* |
| 5 | MacGregor | *9.12 inches.* |
| 6 | MacGregor | *9.34 inches.* |
| 7 | Molten | *1.63 inches.* |
| 8 | Molten | *1.50 inches.* |
| 9 | Neverflat | *1.17 inches.* |
| 10 | Neverflat | *1.70 inches.* |
| 11 | Neverflat | *1.08 inches.* |
| 12 | Neverflat | *2.56 inches.* |
| 13 | Neverflat | *2.3 inches.* |

McFadden conceded that apart from the Molten (competitive class) balls, "the decline exhibited by the Neverflat basketballs is substantially less than the [decline] exhibited by the non-Neverflats." McFadden Tr. 179:5-22; see also id. at 180:3-6; 195:1-10; 252:3-7.[18]

---

[17] See Ex. C to McDonald Decl. pp. 2, 4-15; McFadden Tr. 173:9-179-22; see also id. at 177:13-17 ("Q. Would you agree that that [Sample 3 exhibited] a greater decline than the Neverflat ball we just discussed? A. Sure. Absolutely. . . . Four times [greater] at least.").

[18] i3 characterizes this *superior* Neverflat as showing "significant decline." i3 Rep. 21. At his deposition, McFadden admitted that "[t]here is no scientific, that I know of, standard that says a 5 percent change in a quanti[t]y or in distance or in whatever is significant. It's one of those words that doesn't have, you know, one meaning." McFadden Tr. 258:13-17. He further admitted that just because "in doing measurements it had some significance" doesn't make it "something that is even perceptible to a player necessarily." Id. at 121:11-13; see also id. at 220:14-23 ("[B]asketball players are very particular. . . . some like their ball a little softer, some like it a little harder. I don't know it's better or worse."); 257:4-6 ("[O]ne player likes the ball to

### 2.     i3 Misrepresents Phase II Data By Using Limited Scale Graphs.

i3 visually represents Phase II data on a four-inch scale that "significantly skews the appearance of this rebound height 'decline', which looks much different when reset on a scale that begins at zero (the floor)." Sandusky Rep. ¶ 115; see also id. at ¶ 106 ("i3 reported rebound on charts with misleadingly narrow vertical scales."). And correcting the scale reveals the trick:

| *These results for Sample 13 (for example):* | *when properly depicted, actually look like this:* |
|---|---|



Sandusky Rep. ¶ 115 & Figs. 18 & 18A. Here, Dr. Sandusky simply (1) changed the scale of the vertical axis, (2) added back the 9.4 inches for the diameter of the ball, and (3) included error bars (which i3 had also conveniently failed to depict in its report[19]). Id. at ¶¶ 116-17. "[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district court[] must take care to weigh the value of [this] evidence against its potential to mislead or confuse." United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc).

---

bounce a little higher, the other player likes it to bounce a little lower."). In other words, whether the perceived "decline" in rebound height during Phase II is "significant" is entirely subjective.

[19]   Sandusky notes: "i3 Engineering failed to apply error bars to any of its rebound mean values which implies an invalid precision. . . . I easily calculated that i3's natural rebound error was on the order of plus or minus ~1.5 inches." Sandusky Rep. ¶ 106; see also id. at ¶ 132.

### 3.     i3's Phase II Data Collection Was Not Statistically Sound.

Phase II was comprised of 150 days of storage and one day of testing, plotted at about day 200. This result-driven "testing" was stopped after *a single data point* showed lower rebound height. See Sandusky Rep. ¶ 115; Frey Rep. 16-17. McFadden had no answer for why he didn't perform additional testing in the interim months, saying, "I just didn't." McFadden Tr. 170:2-4.

The data collection was not statistically sound because "[t]here is a single datum on those graphs around 200 days from the start of the test, which is displaced far away in time from all the other observations. . . . [T]his single datum has an unusual degree of influence on the inferences made." Frey Rep. 17; see also Sandusky Rep. ¶ 106.[20] This approach essentially reacted to "noise" in the data, corrupting the conclusion. Id. at 8-9. Thus i3 did not employ a "statistically sound method for gathering data or performing a linear regression." Id. at 17.

### C.     i3's Phase III Contradicted Mr. McFadden's Own Claims Regarding Phase II, Used Improper Inflation Gas, And Was Otherwise Unreliably Conducted.

In Phase III, the Neverflats—still inflated to 7 psi, McFadden Tr. 156:1-157:1; 161:7-162:1—were "re-inflated" with nitrogen to 9 psi and retested. Id. at 155:10-163:11; i3 Rep. 7. This phase conflicts with Mr. McFadden's excuse for not measuring pressure, namely, not wanting to violate Spalding warranties by removing the cap and using a needle in the valve. Phase III took place *within a year* of purchase. Engaging the valve then, after refusing to do so in Phases I and II, underscores the absurdity of i3's excuse for not measuring air pressure all along.

[20] From a statistical perspective, using i3's Sample 13 as an example, Dr. Sandusky noted: "The reported $R^2$ value displayed for the regression equation is 0.55, which means that the model (line) explains only 55% of the variability of the rebound data around its mean." Sandusky Rep. ¶ 115. McFadden admitted that "[w]e had a low of 0.5 and a high of 0.69," although he claimed these values were "reasonable." McFadden Tr. 172:21.173:1. Yet they paled in comparison to the confidence of Dr. Sandusky's work. See, e.g., Sandusky Rep. Fig. 11. As Dr. Sandusky explained, "[i]n order [for i3] to improve this measure [for Phase II], and improve the predictive nature of the regression, they needed several more data sets out past day 200," which they did not have. Id. at ¶ 115; see also Frey Rep. 8-10, 16-17.

Additionally, numerous flaws render Phase III unreliable, including:

i.   Inflation with "nitrogen" was improper since Neverflat uses ████████████ ██████████████████████████, Def.'s 56.1 Statement ¶ 32, and i3 did nothing to compare the relative performance attributes of these gasses.

ii.  "If i3 had added experimental error bars for the natural variation of their study" it would show that "[t]he natural error in measurement overwhelms any conclusion of trend." Sandusky ¶ 124; see also Fig. 20A.

iii. A four (4) inch rebound vertical scale significantly skewed the appearance of the depicted changes in rebound height. When "corrected to the top of the ball and reset on a scale that begins at the floor level," Sandusky ¶ 125, recast data shows:



*These results for Sample 13 (for example):* | *when properly depicted, actually look like this:*

(Sandusky Rep. ¶ 125 & Fig. 20B.) "[A]ll of the data points are captured within the natural experimental error bars. Rebound has not been shown to change at all. Put another way: **All Phase II and III results are somewhere within the statistical 'noise' of Phase I results**." Id. at ¶ 126. i3 "could not have concluded that there was a loss of psi" based on Phase III. Sandusky Rep. ¶ 127; see also id. at ¶ 142 & Fig. 23.

iv.  There was an unexplained 10F increase in temperature. Sandusky Rep. Fig. 19.

And notably, ***over a year and a half after "Phase III***," Mr. McFadden brought the tested balls to his deposition where it was demonstrated on the record that all Neverflats were still inflated, still bounced, and did so significantly better than comparison balls in the recreational category, "which basically go thud." McFadden Tr. 183:2-188:23. Thus, McFadden himself proved that the Neverflat balls stayed inflated significantly longer than traditional basketballs.

In summary, the evidence shows that i3 (1) took no air pressure measurements, (2) mischaracterized and cherry-picked rebound height data, (3) conducted unscientific temperature

normalization, (4) made no reasoned sample selection, and (5) conducted each step in the testing regime with errors and obfuscations. These opinions fall far short of admissibility.

## IV.   MCFADDEN IS NOT QUALIFIED TO OPINE ON BASKETBALL DESIGN, CONSTRUCTION OR INFLATION RETENTION.

Mr. McFadden is an engineer, McFadden Tr. 240:24-241:15, but he is not an expert in basketballs, or in consumer understandings of basketball representations, and has never before undertaken any study of inflatable sports products. Id. at 34:25-36:5; 95:6-12; 108:9-10; 248:20-21; 260:16-22. He admitted to having only "general knowledge" of basketball construction, understanding only that "[t]here was a rubber bladder and some sort of covering. Beyond that, I do not have any other knowledge." Id. at 96:2-6. He did not know the difference between an outdoor and an indoor/outdoor ball or whether they rebounded differently. Id. at 95:21-25 & 97:18-98:1. He did not know anything about composite balls. Id. at 95:6-12. He knew essentially nothing about basketball bladders, windings or carcasses. Id. at 96:11-97:6-10 & 136:24-137:3.[21]

Being an engineer does not itself qualify McFadden to make conclusions and assumptions about basketballs. See, e.g., Ravenell v. Pugmill Systems, Inc., 2014 WL 7146848, at *6 (D.S.C. Dec. 15, 2014) ("[Expert's] status as a licensed Professional Engineer is not, in and of itself, sufficient to qualify him as an expert in this case."); Thompson v. Queen City, Inc., No. A-2002359, 2002 WL 32345733, at *1 (D.S.C. July 9, 2002) ("[A] proffered expert who is an engineer is not necessarily qualified to testify as an expert on any issue within the vast field of engineering."). And this report is brimming with assumptions. Therefore, McFadden's testimony must be excluded to the extent Plaintiff relies on Mr. McFadden's "expertise" to ground claims relating to basketball construction or engineering, or Neverflat inflation retention capabilities.

---

[21] Nor—for purposes of his report in this lawsuit—did Mr. McFadden independently assess, in any way, the manufacturing or physical construction of Neverflat basketballs (including construction of the valve mechanism). McFadden Tr. 23:4-24:7.

Mr. McFadden could have endeavored to alleviate some of his qualification shortfalls by educating himself about basketballs, capabilities of Neverflat components, and prior testing documents concerning performance. But he did not. He had never seen the Complaint, McFadden Tr. 195:25-196:3, never heard of Plaintiff's other expert, id. at 240:14-19, and had never spoken to Plaintiff or seen/tested Plaintiff's ball. Id. at 20:22-21:3. And—inexplicably—he was never provided with *any* Spalding-produced documents by Plaintiff's Counsel. Id. at 72:21-73:1. Simply stated, Mr. McFadden does not show "the level of rigor an expert in the field would apply and does not pass muster under Daubert." Mirena IUD, 169 F. Supp. 3d at 439; accord In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (excluding expert who failed to take "all evidence . . . into account"); In re Neurontin Mktg. and Sales Practices Litig., 2011 WL 3852254, at *37 (D. Mass. Aug. 31, 2011) (excluding expert whose "opinion was not based on a comprehensive review of all available evidence").

## CONCLUSION

For the foregoing reasons, Plaintiffs' expert should not be permitted to testify in the trial of this matter, and his report should be struck from the admissible record.

Respectfully submitted,

Dated:   July 20, 2018          By:   s/ Michael R. McDonald
         Newark, New Jersey           Michael R. McDonald, Esq.
                                      Joshua S. Levy, Esq.
                                      GIBBONS P.C.
                                      One Gateway Center
                                      Newark, New Jersey 07102
                                      Telephone:  (973) 596-4827
                                      Facsimile:  (973) 639-6295
                                      mmcdonald@gibbonslaw.com
                                      jlevy@gibbonslaw.com
                                      *Attorneys for Defendant*
                                      *Russell Brands, LLC*