# THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAISH MARKOS, individually on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br>v.<br><br>RUSSELL BRANDS, LLC,<br><br>          Defendant. | Case No.: 7:16-cv-04362 (CS)<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY BRIEF OF DEFENDANT RUSSELL BRANDS, LLC
IN FURTHER SUPPORT OF MOTION TO EXCLUDE
REPORT AND TESTIMONY OF PLAINTIFF'S EXPERT WITNESS
COLIN WEIR, ECONOMICS AND TECHNOLOGY, INC.**

Michael R. McDonald, Esq.
Joshua S. Levy, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Defendant*
*Russell Brands, LLC*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

LEGAL ARGUMENT .............................................................................................................. 2

I.  WEIR'S "SQUARE PEG INTO ROUND HOLE" PRICE PREMIUM METHOLOGIES CANNOT WITHSTAND *DAUBERT* SCRUTINY. ....................................................... 2

    A.  Weir's Theoretical Construct ............................................................................... 2

        1.  Price Premium For All Class Members At The Point Of Purchase ......... 3

        2.  Calculation of the Value of What Consumers Received ......................... 4

        3.  Performance Is Irrelevant For Weir ........................................................... 5

    B.  Weir's Price Premium Construct Does Not Fit Plaintiff's Asserted Theory Of Liability Because, Where Marketing Statements (Like Neverflat's) Make Promises About A Product's *Performance*, The Value A Consumer Receives Is The Actual Performance. ....................................................................................... 5

    C.  Plaintiff's Opposition Is Meritless ...................................................................... 10

II.  WEIR'S "PRICE PREMIUM" DAMAGES METHODOLOGIES ARE ALSO SPECULATIVE, INSUFFICINT, AND UNRELIABLE—AND MUST BE EXCLUDED. ............................................................................................................. 12

CONCLUSION ........................................................................................................................ 15

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

In re AIG Secs. Litig.,
 689 F.3d 229 (2d Cir. 2012) ................................................................................................14

In re Amla Litig.,
 2018 WL 3629226 (S.D.N.Y. July 31, 2018) .......................................................................11

In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices
 Litig.,
 2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) .....................................................................10

In re Canon Cameras,
 237 F.R.D. 357 (S.D.N.Y. 2006) ...........................................................................................8

In re ConAgra Foods, Inc.,
 302 F.R.D. 537 (C.D. Cal. 2014) .......................................................................................5, 8

Davidson v. Apple, Inc.,
 2018 WL 2325426 (N.D. Cal. May 8, 2018) .....................................................................8, 9

Ebin v. Kangadis Food Inc.,
 297 F.R.D. 561 (S.D.N.Y. 2014) ..................................................................................4, 5, 8

Green v. Green Mountain Coffee Roasters, Inc.,
 279 F.R.D. 275 (D.N.J. 2011) ...............................................................................................8

In re IPO Secs. Litig.,
 471 F.3d 24 (2d Cir. 2008) ............................................................................................14, 15

In re LIBOR,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................................................14

In re POM Wonderful LLC,
 2014 WL 1225184 (C.D.Ca. Mar. 25, 2014) .......................................................................10

R.F.M.A.S., Inc. v. So.,
 748 F. Supp. 2d 244 (S.D.N.Y. 2010) ...................................................................................9

Roach v. T.L. Cannon Corp.,
 778 F.3d 401 (2d Cir. 2015) ..................................................................................................2

Ruffo v. Adidas America Inc.,
 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016) ........................................................................8

Scaggs v. N.Y. State Dep't of Educ.,
    06-cv-799, 2009 WL 890587 (E.D.N.Y. Mar. 31, 2009) ..............................................7

In re Scotts EZ Seed,
    304 F.R.D. 397 (S.D.N.Y. Jan. 26, 20115) ..................................................................10

Singleton v. Fifth Generation, Inc.,
    2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017) ...........................................2, 12, 13, 14

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007) .......................................................................................13

In re Visa Check/Mastermoney Antitrust Litig.,
    192 F.R.D. 68 (E.D.N.Y. Feb. 22, 2000) ......................................................................7

**Rules**

Rule 23 ...............................................................................................................14, 15

Rule 23(b)(3) ................................................................................................................2

Rule 702 .............................................................................................................13, 14

**PRELIMINARY STATEMENT**

Plaintiff's trilogy of deeply flawed experts ends here with Colin Weir. Plaintiff's essentially argue that Weir is bullet-proof because he has offered "price premium" theories in other cases. But, that methodology for calculation of aggregate damages simply does not fit *this case* and his analysis is otherwise so cursory and lacking in foundation as to render it unreliable as a matter of law.

Weir's "price premium" theory is predicated on a theory of liability that is simply not being asserted here — that the advertised components were not in fact in the product. Plaintiff's lawsuit, however, is premised upon a liability theory that although the advertised components were in the product, they did not perform as advertised. No amount of contortion of the facts or evidence can change that critical disconnect which utterly undermines the entire theory of injury in this case.

Indeed, contrary to law and logic, Weir's theory requires assuming injury even where a product performs as advertised. Predictably, Plaintiff's response is that proof of actual injury from alleged underperformance is irrelevant because the purchase price *is* the injury. Likewise, Plaintiff argues that Neverflat performance is irrelevant even though the entire case is predicated upon the performance of Neverflat basketballs. In fact, though making the performance of Neverflat basketballs the sole focus of Plaintiff's opposition to summary judgment, the i3 Daubert and the Veryst Daubert motions, Plaintiff's strikingly disingenuous response here, and in the class certification reply, is to claim that Weir's price premium theory renders performance irrelevant. Weir's theory is so detached from this case that he assumes Plaintiff will be successful proving the falsity of air retention statements even though Plaintiff's technical experts advocate a theory predicated on bounce height, not air pressure retention. Plaintiff's response is that this misstep is

irrelevant because the issue of how high a ball bounces is exactly the same as whether a Neverflat basketball stays inflated 10 times longer than a traditional basketball.

There are even more flaws. Remarkably, the actual analysis necessary to discern whether a price premium exists at all was literally orchestrated by Plaintiff's counsel, who actually told Weir which basketballs he should use for price comparison with Neverflat balls, a process he undertook in treetops manner without regard to specific product attributes.

Naturally, this is hardly the type of intellectual rigor expected of experts.

## LEGAL ARGUMENT

### I. WEIR'S "SQUARE PEG INTO ROUND HOLE" PRICE PREMIUM METHOLOGIES CANNOT WITHSTAND *DAUBERT* SCRUTINY.

It is well-established that "at the class certification stage, Comcast instructs that 'a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury.'" Singleton v. Fifth Generation, Inc., 2017 WL 5001444, at *20 (N.D.N.Y. Sept. 27, 2017) (quoting Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015). Though Weir predictably proclaims that his price premium models were "designed to mirror plaintiff's stated theory of liability," Weir Tr. 141:23-24, they do not. And for numerous other reasons, as well, his proffered opinions fail to reach the threshold for admissibility under Daubert.

#### A. Weir's Theoretical Construct

Preliminarily, given that Plaintiff's briefs take utterly contradictory and incorrect positions regarding performance and injury with respect to the legal claims being advanced, it is beneficial to unpack precisely what Weir contends.

2

### 1. Price Premium For All Class Members At The Point Of Purchase

Weir's "price premium" methodology is first predicated upon the assumption that Plaintiff will be successful in proving his "theory of liability," reportedly, "that the marketing claim 'Neverflat' and stays inflated for the one year -- 10 times longer than a traditional ball" are deceptive and confusing to a reasonable consumer and should not have been made." Weir Tr. 86:15-19. Given the basic rationale that the marketing statements are false, Weir's price premium methodology assumes all ***consumers paid for the Neverflat technology but did not receive it***: (i) "consumers [] receive no value from the Neverflat technology,"; (ii) "the Neverflat technology does not work." Weir Rpt. 2, 4. And, because Neverflat basketballs were priced higher than the other balls in his sample, he opined that the alleged marketing statements[1] "caused there to be a market price premium." Weir Tr. 67:23-68:15. Thus, "[w]hen a consumer purchases one of these balls and pays that market

---

[1] Described by Weir as: "Neverflat" and only ball "guaranteed to stay fully inflated for at least one year -- 10X longer than any traditional basketball." See, e.g., Weir Tr. 74:7-22; 78:20; 54:20-56:1; 78:20-79:25. On the subject of Spalding's representations, in opposition to the Weir Daubert brief, Plaintiff's counsel somewhat bizarrely argues that Spalding has admitted to classwide damages because of a concession that "NEVERFLAT basketballs [only] get flat more slowly than comparable basketballs." Weir Opp. 8. Plaintiff articulates his "slower flat" point as if this is some smoking gun—and not *exactly* what Spalding is advertising. What could "Stays Inflated 10x Longer" or "No need to add air pressure during the first year" mean, see Pl.'s 56.1 Response ¶ 38, except that, indeed, Neverflat basketballs get flat more slowly than other balls? Indeed, Plaintiff himself appears to acknowledge this reality, when—in the same breath as making his "slower flat" point—he characterizes *his* impression of Neverflat advertising as representing that the product "never goes flat ***for a significant period of time***." Weir Opp. Br. 8 (emphasis added). This convoluted phrasing, if even meaningful at all, is simply another way of saying, "gets flat more slowly." If all Plaintiff has managed to prove is that Neverflat basketballs "get flat more slowly than comparable basketballs," then he has proven nothing. There has been no classwide injury; there can be no classwide damages; Colin Weir's testimony must be excluded; and class certification must be denied.

price premium, . . . those consumers are harmed." Id.; see also id. at 49:9-11; 71:4-8; Weir Rpt. 2, 4, 8-9.

### 2. Calculation of the Value of What Consumers Received

As for calculation of the "price premium," Weir proposes "measur[ing] the difference between the price paid for the [Neverflat] Products as promised, and the *value of the [Neverflat] Products without the Neverflat technology.*" Rpt. 4. Thus, Weir actually theorizes that the products were advertised as Neverflat basketballs but the basketballs did not have the Neverflat technology: "What's being tested here is *the presence, versus absence, of the Neverflat technology*." Weir Tr. 153:16-17 (emphasis added). Since the model assumes the consumers did not receive the Neverflat technology, it assumes the Neverflat technology was valueless. See Weir Opp. 8. Plaintiff's opposition doubled down on the "no-value" theme admitting that Plaintiff's theory is that Neverflat technology is "valueless," "worthless," provides "zero" value to consumers. Id. 6-11.

### 3. Performance Is Irrelevant For Weir

As for the impact of *performance* of any individual putative class member's Neverflat ball on the value received, Weir conveniently asserts that performance *is irrelevant,* Tr. 92:16-93:4, because, per his model, everyone who purchased a Neverflat was necessarily harmed by paying the price inflated by the marketing statements. Weir Tr. 87:13-25; 92:16-93:4. In fact, in the certification motion, Plaintiff relies heavily upon Weir's theory that "performance is irrelevant" because "the injury . . . is the payment of a price premium." Pl.'s Cert. Reply Br. 5, 8. Indeed, Plaintiff proffers this theory to argue that the Court should (i) ignore his own expert's (Brown's) admission that no evidence exists that all class members experienced the same underperformance relative to what was represented; and thus literally (ii) assume class-wide injury. Id. In fact, citing Ebin v.

4

Kangadis Food Inc., 297 F.R.D. 561, 568 (S.D.N.Y. 2014), and other similar "100% natural" cases, Plaintiff argues, incorrectly, that performance is *irrelevant* because he need only show the premium price "*at the time of purchase* was attributable to Neverflat Representations." Pl.'s Cert. Reply Br. 8.

As demonstrated below, each of these arguments are wrong as a matter of law.

**B. Weir's Price Premium Construct Does Not Fit Plaintiff's Asserted Theory Of Liability Because, Where Marketing Statements (Like Neverflat's) Make Promises About A Product's *Performance*, The Value A Consumer Receives Is The Actual Performance.**

Applying Weir's price premium damage (and injury) theory to this case, see Pl.'s Cert. Reply Br. 5, 8, 10-11, is like trying to jam a large square peg into a small round hole—it just doesn't fit. Plaintiff's reliance on Ebin and other 100% natural cases to support Weir's theory demonstrates the point. Where statements about a product's ***composition*** are false, a consumer would necessarily receive something less than what was promised at the point of purchase, and a theory that *all* purchasers paid a "price premium" has been found suitable in such labeling cases (i.e., where the nature of the claim is "the product was not what it said it was"). See, e.g., Ebin, 297 F.R.D. at 564-72 (S.D.N.Y. 2014) (If the product was not "100% Pure Olive Oil," then all purchasers were injured by being overcharged and damages could be assessed via a point-of-purchase "price premium" analysis.); In re ConAgra Foods, Inc., 302 F.R.D. 537, 547 (C.D. Cal. 2014) (All class members harmed at point of purchase if cooking oils were not "100% Natural" as advertised.). Critically, in such cases, the statements concern the product's composition, not its performance.

5

The marketing statements upon which this lawsuit is based are obviously ***performance-based*** representations (e.g., Neverflat stays inflated 10x longer).[2] And indeed, Plaintiff's technical experts' opinions at least purported to address the "advertised performance" claims. Even Markos admits that his claims are fundamentally based upon an alleged failure of performance of his basketball.[3] Given that Neverflat performance is the core issue here, a damage/injury model predicated on the notion that performance is irrelevant is a huge red flag, and rightly so.

At its core, Weir's price premium model wrongly interprets Neverflat performance-based statements as ***"composition-based"*** representations. He plainly stated his theory as such by explaining that consumers paid for the Neverflat technology but did not receive it ("measur[ing] . . . value of the [Neverflat] Products without the Neverflat technology," Rpt. 4). If that was indeed the theory of liability advanced by Plaintiff (i.e., that the advertised components were not in fact in the product) Weir's model would at least make *some* sense because, if a product does not conform to marketing statements about the ***composition of a product***, by definition, the consumer is not receiving the benefit of her bargain at the

---

[2] The Complaint makes this abundantly clear. See, e.g., Compl. ¶¶ 7 ("Independent testing has shown that the Products lose significant air pressure."), 9 ("A reasonable consumer purchases the Products believing they will remain fully inflated."), 13 ("Plaintiff paid a premium for the Product and opted against buying less expensive basketballs not advertised as 'NEVERFLAT,' guaranteed to stay fully inflated, and to maintain a rebound height between 54 and 60 inches over 12 months.").

[3] In opposing summary judgment, Markos argued—unwittingly demonstrating the inherently individualized nature of his class-wide defect claim—that he did not receive the full value of his purchase because ***his basketball did not perform as advertised or to his bounce expectations***. MSJ Br. 8. He claimed his basketball's underperformance was that it "did not bounce as high as it did when he first began to use it." Id. at 4, 8-10; see also Pl.'s 56.1 Resp. ¶ 9 (Plaintiff: "I think it's very – it's more like a feel I would say. . . . I can only mention what is adequate for me. I will not be able to tell you what is adequate for you or adequate for any other person.").

6

point of purchase. To use Weir's incorrect construct as an example, if a consumer paid for a basketball marketed as containing Neverflat technology, but the ball she received actually did not contain those marketed components (i.e., was "***without the Neverflat technology***" Rpt. 4), no amount of "performance" or enjoyment of the product would change the fact that the marketed, paid-for components were not provided. Clearly, though, *that* is not Plaintiff's theory.

On the contrary, Plaintiff's theory is that Neverflat technology did not perform as advertised. Naturally, if a consumer purchased a Neverflat basketball and the basketball performed precisely as advertised (stayed inflated for at least one year -- 10X longer than traditional basketballs, etc.), she would have received the full value of her purchase. Thus, Plaintiff's and Weir's assumption of class-wide injury is wrong. Weir's own testimony shows that his model runs counter to law and logic by literally assuming that the millions of satisfied Neverflat customers suffered injury regardless of their products' performance. Tr. 74:3-22; 87:13-25; 80:1-81:11.[4]

---

[4] Fundamentally, Weir's (and Plaintiff's) class-wide injury theory erroneously conflates the calculation of damages with *the fact of damage* and Plaintiff attempts to hide behind this flawed theory to avoid any real evidence of class-wide injury. The fact of damage, often synonymous with "injury," is an element of liability requiring Plaintiff to prove that he suffered some harm traceable to the defendant's conduct. See, e.g., In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 82 (E.D.N.Y. Feb. 22, 2000) ("The *fact* of injury, which is required as an element of the plaintiff's claim, should not be confused with the *extent* of injury (as reflected by the amount of damages), which may not be amenable to establishment with great precision.") (emphasis added); Scaggs v. N.Y. State Dep't of Educ., 06-cv-799, 2009 WL 890587, at *7 (E.D.N.Y. Mar. 31, 2009) ("[W]here demonstrating the fact of damage requires more individualized proof, courts will decline class certification.") (quotation omitted). Determining the "fact of damage" or "injury" for any aggregate class-wide injury model premised upon marketing statements requires careful consideration of the nature and content of the marketing statements, which both Weir and Plaintiff fail to undertake.

Although there *are* cases, like Ebin and ConAgra, in which the point-of-purchase/price premium damages model "fit"—this theory does not work here because the Neverflat representations at issue are about the ***performance*** of the basketball, ***not its static composition***. In cases involving performance-based statements, the value of what a consumer received cannot be evaluated without considering whether the products performed as advertised. In fact, as *Plaintiff* points out, in Ruffo v. Adidas America Inc., 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016), "[t]o prove injury in Ruffo classwide, the plaintiff [had] to prove every class member's sneakers fell apart." Pl.'s Cert. Reply Br. 7 n. 16.

In another useful example, in Davidson v. Apple, Inc., 2018 WL 2325426 (N.D. Cal. May 8, 2018), a class was alleging the presence of certain iPhone defects. Invoking Comcast, the court noted that a damages model "'must measure only those damages attributable to' the plaintiff's theory of liability." Id. at *21. And, in Davidson, the court held that the plaintiffs' damages expert's "methodology is fatally flawed because it assumes that the touchscreen defect will manifest in all iPhones." Id. at *22. Essentially, "[m]issing from [the damages model was] any suggestion that defect might not manifest." Id. at *23; see also In re Canon Cameras, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) ("[P]roof of malfunction is a prerequisite to any of plaintiffs' claims, and yet they do not meaningfully contest that the class they seek to certify likely consists in overwhelming measure of owners of cameras that did not malfunction at all."); Green v. Green Mountain Coffee Roasters, Inc., 279 F.R.D. 275, 284-85 (D.N.J. 2011) ("Plaintiff actually

acknowledges that there are members in the putative class who have not yet [experienced the defect].").[5]

And, like in Davidson, "[m]issing from [Colin's Weir's model was] the suggestion that defect might not manifest." 2018 WL 2325426 at *23. Here, of course, the evidence is that over 99% of Neverflat purchasers were satisfied with their basketball's performance (as there was an infinitesimal return rate of less than 0.05%, Decl. of Angie Doig in Opp. to Class Cert. & in Support of Spalding's Daubert Motions). The inability to account for advertised performance renders Weir's analysis "fatally flawed," id. at *22, just as in Davidson.

In sum, Plaintiff's entire theory of this case surrounds *performance*-based representations, the proffered model which ignores performance is "not connected to the facts of the particular case at hand, . . . the estimate is inadmissible." R.F.M.A.S., Inc. v. So., 748 F. Supp. 2d 244, 277 (S.D.N.Y. 2010).[6]

---

[5] Spalding marketing expert Joel H. Steckel, Ph.D., makes a related point:

> Economists have developed a classification of products corresponding to if and when consumers acquire information about the attributes or properties of those products. Products, such as the basketballs in question, whose relevant attributes or properties become known through trial and use are called experience products[, which] lend themselves to expectation disconfirmation processes. In other words, if a customer's expectations for basketball performance are not met, she will learn that and be able to complain or return the product.

Steckel Rep. 31-32 n. 56 (citations omitted). Neverflat basketballs are experience products—and whether a given performance representation is met is largely, if not entirely, dependent on how a given purchaser experiences his or her basketball *post-purchase*.

[6] Importantly, post-purchase *performance* is not the only reason why this case is genres apart from "100% natural"-type litigation. Two other distinctions similarly render a uniform, point-of-purchase damages model unsuitable here. *First*, from a *pre-purchase* perspective, one Neverflat ball is not necessarily like all others. For example, it is

### C. Plaintiff's Opposition Is Meritless

To prevail on his GBL § 349 and 350 claims, Plaintiff must show "actual harm as to each class member caused by the defendant's conduct." In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices Litig., 2015 WL 5730022, at *7 (S.D.N.Y. Sept. 30, 2015). Damages are measured by the difference "between what plaintiff paid and the value of what plaintiff received." In re Scotts EZ Seed, 304 F.R.D. 397, 412 (S.D.N.Y. Jan. 26, 20115) (quoting In re POM Wonderful LLC, 2014 WL 1225184 at *3 (C.D.Ca. Mar. 25, 2014)). Thus, determining the value of what putative class members received from their purchases *here* requires inquiry into *post-purchase* performance of their Neverflat basketballs.

Plaintiff now misleadingly argues that—simply because Mr. Weir asserts the *existence* of a price premium, that is, merely because some Neverflat basketballs are more expensive than some non-Neverflats—proof of a common defect and common underperformance is unnecessary. See, e.g., Weir Opp. 6-7 ("[T]he only impact, if any, the disputed worth of NEVERFLAT technology would have would be on the final damages

---

undisputed that Neverflat rebound height is impacted by cover material. See, e.g., Pl.'s 56.1 Resp. ¶ 26. Plaintiff's own (flawed) expert report gleaned performance distinctions between types of Neverflat. See, e.g., Veryst Rep. 4-5 & 15; see also Brown Tr. 113:22-25 ("Q. . . . [T]his test shows the NeverFlat indoor/outdoor retaining air pressure longer than 12 months, does it not? A. Yes, it appears that way."). And, both the nature of and manufacturing process surrounding a key component of Neverflat technology—

See i3 Reply Br. 11-12 & n.7. *Second*, focusing again *post-purchase*, it is undisputed that Neverflat basketballs are impacted by the environment, including by variations in barometric pressure, altitude, and temperature. Pl.'s 56.1 Resp. ¶ 27. And—unlike the purchaser of some "100% natural" oil (whose composition is unchanged, regardless of environmental circumstances)—the performance characteristics of a Neverflat basketball will absolutely vary with the external context. A bottle of oil is "100% natural" in whatever climate, at whatever temperature, at whatever elevation, barometric pressure, or surface. *Not so* with respect to the performance of an inflatable basketball.

10

calculations, which could easily be discounted if the jury determined NEVERFLAT technology provides some additional benefit over traditional basketballs."); id. at 6 ("[T]he challenged 'assumption' of NEVERFLAT's added value has no effect on Mr. Weir's methodologies."). In other words, Plaintiff asserts that this "price premium" effectively absolves him from having to demonstrate actual injury and causation. Pl.'s Cert. Reply Br. 5, n. 14; id. at 8. This argument is meritless. New York law is clear: deception without injury is not actionable. In re Amla Litig., 2018 WL 3629226, at *12 (S.D.N.Y. July 31, 2018). Similarly, *expense* without harm is no harm at all. And Plaintiff's attempt to pass off Mr. Weir's "price premium" assessment as evidence of *liability* reveals both the weaknesses in that Report, as well as in Plaintiff's case more broadly.

Further, as Spalding pointed out in its moving brief, Weir's Report and testimony are critically disconnected from Plaintiff's experts' theory of liability, given Weir's wholesale ignorance of the rebound-height claims around which Plaintiff's case is actually built. Weir Daubert Br. 2-4.

Plaintiff responds by doubling-down—to an extreme degree—on his argument that inflation and rebound height are "correlated." Plaintiff goes so far as to assert that his claims about inflation and rebound height are "one in the same," Weir Opp. Br. 5, that Spalding's representations about inflation and rebound height are "used interchangeably" (obviously false), and that the differences between claims about inflation and rebound height are "meaningless semantical distinction[s]." Id.; see also id. at 6 (referring to "this cherry-picked distinction between inflation and rebound height"). Plaintiff thus views the myriad allegations in the Complaint, as well as the handful of performance accusations contained in his engineering "expert reports," as identical. Plaintiff is asserting, for

11

example, that i3 and Veryst observing (via their own flawed analyses) few-inch declines in rebound height for a handful of Neverflat basketballs, see, e.g., i3 Rep. 16-17, Veryst Rep. 14, *is the same thing* as demonstrating that all Neverflat basketballs exhibit an "initial rebound height . . . between 46 inches and 48 inches," Compl. ¶ 29(b), "never achieve the minimum advertised rebound height," id. at ¶ 8, lose "approximately 2 psi over a 200 day period," id. at ¶ 29(a), do not "Stay[] Inflated 10x Longer Guaranteed!", id. at ¶ 28, require all consumers "to add air pressure during the first year," id. at ¶ 26, and prove that "Plaintiff's Product became flat." Id. at ¶ 14. This cannot be—and obviously is not—the case. And this error in analysis is as critical a flaw in Weir's opinions, as it is in Plaintiff's bid for class certification and opposition to summary judgment.

## II. WEIR'S "PRICE PREMIUM" DAMAGES METHODOLOGIES ARE ALSO SPECULATIVE, INSUFFICINT, AND UNRELIABLE—AND MUST BE EXCLUDED.

Incredibly, Plaintiff *opens his brief* by quoting from Singleton v. Fifth Generation, Inc., 2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017), a case that that specifically underscores the unreliability of Weir's model. In Singleton, plaintiff alleged that the advertising for Tito's Handmade Vodka (the vodka was "Handmade" and "Crafted in an Old Fashioned Pot Still") was deceptive and, inter alia, violated GBL § 349. 2017 WL 5001444 at *1-2. But, in Singleton, class certification was *denied* because of the failings of the plaintiffs' damages experts for many of the same reasons present here.

First, Weir, like the expert in Singleton, "admittedly did not consider [relevant] characteristics" of the basketballs he utilized for his comparison. 2017 WL 5001444 at *20-21. Weir was and is entirely ignorant of the features of both Neverflat and traditional basketballs. See Weir Daubert Br. 1-2, 5, 1-13. He ignores the reality of the complicated, inter-relational nature of the Neverflat components, that *there is no such product as a*

12

*Neverflat basketball without "Neverflat technology,"*[7] and the very real distinctions among the traditional basketballs selected as comparators in each category. Id. at 12. This is perhaps no surprise, as essentially the entirety of his "side by side"/comparator model was constructed by Plaintiff's *counsel*, from which Weir never deviated. Id. at 7-8. Simply put, "[w]ithout an adequate basis for comparison," Weir "cannot isolate the premium associated with the [Neverflat representations]. Accordingly, Plaintiff has not shown that the proposed comparator model may be used to measure damages tied to the class's theory of injury." Singleton, 2017 WL 5001444 at *20-21.[8]

Second, Singleton is similarly instructive on the weaknesses of Weir's hedonic regression and conjoint analysis "models."

- **Insufficiently detailed conjoint analysis**: "[T]his model lacks sufficient detail to permit the Court to determine whether it satisfies Comcast and is suitable to the task at hand. . . . [Expert's] description of the proposed process is vague and lacks the sort of step-by-step detail necessary to evaluate whether the methodology is workable here. Indeed, [expert] devotes only three paragraphs (in his 111 paragraph second report) to conjoint analysis. While Krosnick need not test or implement the model at this stage, he must provide enough information to demonstrate its potential application to this case and Plaintiff's theory of liability. Krosnick's skeletal analysis falls short." Id. at *21-22.

---

[7] Weir's reference to Spalding's witness testimony does *nothing* to undermine this fact. Paul Sullivan, who Weir quotes, indeed testified that "[i]f you took out the Neverflat features and benefits, yes, it would be a traditional indoor/outdoor ball." Weir Rpt. 3. But this was obviously not meant as a technical, *physical* description of the differences between Neverflats and all non-Neverflat products. Mr. Sullivan—a *non-*30(b)(6) witness—was simply explaining the general purpose behind Neverflat basketballs, that is, to stay inflated longer than traditional balls. Russell *did* produce a 30(b)(6) witness on Neverflat engineering and construction, Product Development witness Lynn Smith, who Mr. Weir conveniently ignores for purposes of his Report.

[8] Plaintiff's arguments against the reality that his "direct comparison" is unreliable essentially boil down to a single point: That Spalding "offers no explanation for why the comparator basketballs chosen by Mr. Weir do not compare to NEVERFLAT." Weir Opp. 11. Obviously this is incorrect. See, e.g., Weir Daubert Br. 6-13. And more than that: It is "[t]he *proponent* of expert testimony [who] has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (emphasis added).

13

- **Insufficiently detailed hedonic regression**: "Although hedonic regression analysis has been proposed and approved in some product labeling class actions, Krosnick's proposed model again lacks sufficient detail to permit the Court to determine whether it satisfies Comcast and is suitable to the task at hand. . . . Krosnick has not explained how a hedonic regression model can isolate the effect of the 'handmade representation' in this case while accounting for other relevant product attributes, including product quality. Krosnick's model requires, at a minimum, some metric to account for product quality. His analysis is once again too superficial to support the proposed model." Id. at *22.[9]

As explained in Spalding's moving brief, each such deficiency is present here.

Finally, Plaintiff seems to suggest that since "the Daubert analysis is cabined by its purpose" at the class certification stage, some lesser, more liberal standard should apply to his experts' methodologies, including excusing Weir's failure to actually perform any survey, regression or conjoint analysis. Weir Opp. 3-4, 13-15. However, it is beyond dispute that the court must conduct a "rigorous analysis" of all issues affecting Rule 23 requirements, including experts. See In re LIBOR, 299 F. Supp. 3d 430, 470, § II.2.2 (S.D.N.Y. 2018) ("[W]e interpret the Second Circuit's decisions in In re IPO, Bombardier, and In re U.S. Foodservice, as supporting a more searching examination of expert testimony offered at the class certification stage); In re AIG Secs. Litig., 689 F.3d 229, 237

---

[9] Plaintiff argues that the Weir Report "provides a detailed analysis of his hedonic regression methodology, as well as a preliminary hedonic regression." Weir Opp. 13. He essentially argues that, because he included *some* variables, his model is reliable and admissible. Id. at 14. He similarly argues that his report "provides a detailed discussion of how he would proceed with conducting [a conjoint] analysis." Weir Opp. 16. He explains that "Mr. Weir provides a specific example illustrating a conjoint choice task in which two choices are presented to a survey responder." Id. But, obviously, that Weir put in *some* effort does not itself make that effort "the product of reliable principles and methods" or mean that he "has reliably applied the principles and methods to the facts." FED. R. EVID. 702. And it remains *Plaintiff's* burden to demonstrate Weir's admissibility under Daubert, which he has not done.

(2d Cir. 2012); In re IPO Secs. Litig., 471 F.3d 24, 33 (2d Cir. 2008). In fact, the Second Circuit in In re IPO held:

> that a district judge may not certify a class without making a ruling that each Rule 23 requirement is met and that a lesser standard such as "some showing" for satisfying each requirement will not suffice, (2) that all of the evidence must be assessed as with any other threshold issue, (3) that the fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met. . . [Id. at 27]

Moreover, notwithstanding the focus of a Rule 23 analysis, here, *all* discovery is closed. The parties have briefed *both* Plaintiff's motion for class certification *and* Spalding's motion for summary judgment. Virtually all merits issues are thus necessarily in play. Thus, given all of the above, the argument made throughout Plaintiff's Reply on class certification, that Spalding's reliance on expert evidence is a "merits issue" which the Court need not address, is obviously wrong.

## CONCLUSION

For the foregoing reasons, Plaintiff's expert Colin Weir should not be permitted to testify in the trial of this matter, and his report should be stricken from the admissible record.

Respectfully submitted,

Dated: December 14, 2018　　By:　s/ Michael R. McDonald
　　　　Newark, New Jersey　　　　　Michael R. McDonald, Esq.
　　　　　　　　　　　　　　　　　　Joshua S. Levy, Esq.
　　　　　　　　　　　　　　　　　　GIBBONS P.C.
　　　　　　　　　　　　　　　　　　One Gateway Center
　　　　　　　　　　　　　　　　　　Newark, New Jersey 07102
　　　　　　　　　　　　　　　　　　Telephone: (973) 596-4827
　　　　　　　　　　　　　　　　　　Facsimile:  (973) 639-6295
　　　　　　　　　　　　　　　　　　mmcdonald@gibbonslaw.com
　　　　　　　　　　　　　　　　　　jlevy@gibbonslaw.com
　　　　　　　　　　　　　　　　　　*Attorneys for Defendant*
　　　　　　　　　　　　　　　　　　*Russell Brands, LLC*